**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL PARKS CONSERVATION ASSOCIATION**, et al.,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>**DOUG BURGUM, in his official capacity as Secretary of the Interior**, et al.,<br><br>*Defendants*. | **Case No. 26-cv-02103 (EGS)** |

**PLAINTIFFS' COMBINED MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION OR 5 U.S.C. § 705 STAY AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS


Introduction ........ 1

Background ........ 3

I. The National Mall and West Potomac Park are carefully designed for the enjoyment of the public. ........ 3

II. Congress establishes a comprehensive process for constructing new monuments. ........ 4

III. The first and second Trump administrations develop plans for a sculpture garden. ........ 6

IV. Defendants adopt and begin to implement the West Potomac Plan. ........ 8

V. Construction activity breaks out at West Potomac Park. ........ 11

Argument ........ 13

I. Plaintiffs are entitled to a preliminary injunction or 5 U.S.C. § 705 stay. ........ 13

A. Plaintiffs are likely to demonstrate standing. ........ 14

1. The West Potomac Plan harms Mr. Longenecker and members of NPCA and the Committee of 100. ........ 14

2. The West Potomac Plan harms the organizational plaintiffs. ........ 22

B. Plaintiffs are likely to succeed on the merits. ........ 24

1. The West Potomac Plan is final agency action. ........ 24

2. The West Potomac Plan violates the Commemorative Works Act. ........ 30

3. The West Potomac Plan violates 40 U.S.C. § 8106. ........ 32

C. The West Potomac Plan irreparably harms Plaintiffs. ........ 33

D. The balance of the equities and public interest favor preliminary relief. ........ 35

II. Plaintiffs have plausibly alleged their claims. ........ 36

Conclusion ........ 39

**TABLE OF AUTHORITIES**

**Cases**

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967).....27

*Am. Tunaboat Ass'n v. Ross*,
391 F. Supp. 3d 98 (D.D.C. 2019).....24

*Amoco Prod. Co. v. Village of Gambell*,
480 U.S. 531 (1987).....33

*Ass'n of Am. Univs. v. Dep't of Energy*,
789 F. Supp. 3d 118 (D. Mass. 2025).....27

*AT&T Corp. v. FCC*,
349 F.3d 692 (D.C. Cir. 2003).....29

*Attias v. CareFirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017).....18, 37

*Bennett v. Spear*,
520 U.S. 154 (1997).....26

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*,
972 F.3d 83 (D.C. Cir. 2020).....25

*Brady Campaign to Prevent Gun Violence v. Salazar*,
612 F. Supp. 2d 1 (D.D.C. 2009).....33, 35

*Cal. Cmtys. Against Toxics v. EPA*,
928 F.3d 1041 (D.C. Cir. 2019).....17

*Cent. Tex. Tel. Coop., Inc. v. FCC*,
402 F.3d 205 (D.C. Cir. 2005).....25

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006).....13

*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984).....36

*Clarke v. Off. of Fed. Hous. Enter. Oversight*,
355 F. Supp. 2d 56 (D.D.C. 2004).....36

*Ctr. for Biological Diversity v. Jackson*,
815 F. Supp. 2d 85 (D.D.C. 2011).....37

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
144 F.4th 296 (D.C. Cir. 2025) .................... 14, 16

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
146 F.4th 1144 (D.C. Cir. 2025) .................... 17, 22

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*,
585 F. Supp. 3d 63 (D.D.C. 2022) .................... 37

*District of Columbia v. U.S. Dep't of Agric.*,
444 F. Supp. 3d 1 (D.D.C. 2020) .................... 13

*Drs. for Am. v. Off. of Pers. Mgmt.*,
766 F. Supp. 3d 39 (D.D.C. 2025) .................... 25

*Elec. Power Supply Ass'n v. FERC*,
391 F.3d 1255 (D.C. Cir. 2004) .................... 29

*Fed. Educ. Ass'n v. Trump*,
795 F. Supp. 3d 74 (D.D.C. 2025) .................... 33

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .................... 14, 16

*Fund for Animals v. Norton*,
281 F. Supp. 2d 209 (D.D.C. 2003) .................... 33, 35

*Fund for Animals v. Williams*,
391 F. Supp. 2d 132 (D.D.C. 2005) .................... 26

*Hennepin County v. HHS*,
No. 26-cv-2460, 2026 WL 2426300 (D.D.C. Aug. 19, 2026) .................... 25

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .................... 15

*In re Idaho Conservation League*,
811 F.3d 502 (D.C. Cir. 2016) .................... 19

*Indep. Equip. Dealers Ass'n v. EPA*,
372 F.3d 420 (D.C. Cir. 2004) .................... 25

*Int'l Dark-Sky Ass'n v. FCC*,
106 F.4th 1206 (D.C. Cir. 2024) .................... 17

*Jibril v. Mayorkas*,
20 F.4th 804 (D.C. Cir. 2021) .................... 19

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) .......... 34

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 36

*Leedom v. Kyne*,
358 U.S. 184 (1958) .......... 38

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 14, 37

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014) .......... 14

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 14

*N.Y. Stock Exch. LLC v. SEC*,
2 F.4th 989 (D.C. Cir. 2021) .......... 25

*N.Y. Stock Exch., Inc. v. Bloom*,
562 F.2d 736 (D.C. Cir. 1977) .......... 27

*Nat. Res. Def. Council, Inc. v. Jamison*,
787 F. Supp. 231 (D.D.C. 1990) .......... 23

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*,
752 F.3d 999 (D.C. Cir. 2014) .......... 28

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.* (*Nat'l Tr. for Historic Pres. I*),
821 F. Supp. 3d 62 (D.D.C. 2026) .......... 29

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.* (*Nat'l Tr. for Historic Pres. II*),
827 F. Supp. 3d 93 (D.D.C. 2026) .......... 34, 36

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.* (*Nat'l Tr. for Historic Pres. III*),
No. 26-5123, 2026 WL 2276494 (D.C. Cir. May 7, 2026) .......... 32, 36, 39

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.* (*Nat'l Tr. for Historic Pres. IV*),
No. 26A203, 2026 WL 256318 (U.S. Aug. 31, 2026) (per curiam) .......... 17, 18, 32

*Nat'l Wildlife Fed'n v. Burford*,
835 F.2d 305 (D.C. Cir. 1987) .......... 33

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
886 F.3d 803 (9th Cir. 2018) .......... 33

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) ........ 39

*Nyunt v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009) ........ 39

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
797 F.3d 1087 (D.C. Cir. 2015) ........ 23

*Pueblo of Santa Ana v. Hodel*,
663 F. Supp. 1300 (D.D.C. 1987) ........ 28

*Sackett v. EPA*,
566 U.S. 120 (2012) ........ 27

*San Diegans for Mt. Soledad Nat'l War Mem'l v. Paulson*,
548 U.S. 1301 (2006) ........ 34

*Sierra Club v. FERC*,
827 F.3d 36 (D.C. Cir. 2016) ........ 23

*Sierra Club v. Jewell*,
764 F.3d 1 (D.C. Cir. 2014) ........ 17, 19

*Sierra Club v. Marsh*,
872 F.2d 497 (1st Cir. 1989) ........ 24, 35

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ........ 17

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ........ 18

*Tefera v. OneWest Bank, FSB*,
19 F. Supp. 3d 215 (D.D.C. 2014) ........ 37

*U.S. Air Tour Ass'n v. FAA*,
298 F.3d 997 (D.C. Cir. 2002) ........ 29

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) ........ 26

*Valley Cmty. Pres. Comm'n v. Mineta*,
373 F.3d 1078 (10th Cir. 2004) ........ 33

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) ........ 17

*Village of Bensenville v. FAA*,
376 F.3d 1114 (D.C. Cir. 2004) .......... 30

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .......... 24

*WildEarth Guardians v. Jewell*,
738 F.3d 298 (D.C. Cir. 2013) .......... 23

**Statutes**

5 U.S.C.
§ 551(4) .......... 25
§ 551(6) .......... 25
§ 704 .......... 26

40 U.S.C.
§ 8106 .......... 2, 6, 13, 26, 32, 39
§ 8901(2) .......... 4
§ 8901(3) .......... 4
§ 8901(4) .......... 5, 30
§ 8902(a)(1) .......... 5, 30
§ 8902(a)(3) .......... 5
§ 8902(a)(4) .......... 5, 31
§ 8903(c) .......... 5, 31
§ 8905(a)(1) .......... 5, 23, 31
§ 8905(a)(2) .......... 5, 23, 31
§ 8908 .......... 31
§ 8908(c) .......... 5, 30, 31, 39

42 U.S.C. § 4332 .......... 23

54 U.S.C. § 306108 .......... 23

Act of Mar. 3, 1897, ch. 375, 29 Stat. 624 .......... 3, 27, 32

Pub. L. No. 108-126, 117 Stat. 1348 (2003) .......... 5, 31

Pub. L. No. 111-88, 123 Stat. 2904 (2009) .......... 31

Pub. L. No. 117-81, 135 Stat. 1541 (2021) .......... 31

**Executive Orders**

Exec. Order No. 13934, 85 Fed. Reg. 41165 (July 3, 2020) .......... 6

Exec. Order No. 13978, 86 Fed. Reg. 6809 (Jan. 18, 2021) .......... 6

Exec. Order No. 14029, 86 Fed. Reg. 27025 (May 14, 2021) .......... 6

Exec. Order No. 14189, 90 Fed. Reg. 8849 (Jan 29, 2025) .......... 6, 7, 18

**Other Authorities**

Bailey Johnson, *It's a D.C. Rec Sports Haven, but Trump Wants It for His 'Heroes' Sculpture Park*, Wash. Post (May 23, 2026), https://perma.cc/Q3VL-XU6G .......... 4

*C--NAMA 245076 - Tidal Basin Redevelopment Plan*, SAM.gov, https://perma.cc/P67C-RL5K .......... 11, 34

*Commemorative Areas Washington, DC and Environs (Map Number 869/86501 B)*, Nat'l Park Serv. (June 24, 2003), https://perma.cc/NS43-RCZ3 .......... 5, 30

Dan Diamond, *Trump Announces Planned D.C. Site for Massive Sculpture Garden*, Wash. Post (May 15, 2026), https://perma.cc/L3MY-WN9P .......... 9, 24

David A. Fahrenthold et al., *Who Approves Trump's Washington Makeover Projects?*, N.Y. Times (Sep. 2, 2026), https://perma.cc/9QTC-2CL7 .......... 11

Donald J. Trump (@realDonaldTrump), Truth Social (May 15, 2026, at 4:52 AM), https://perma.cc/M6W9-TUF2 .......... 9, 18, 20, 28

*East and West Potomac Parks Historic District*, DC Historic Sites, https://perma.cc/LK7B-M2LB .......... 3

Emily Badger, *Trump's D.C. Makeover Projects Are 'Only an Idea,' Until They're Much More*, N.Y. Times (Sep. 3, 2026), https://perma.cc/JFL3-LGSB. .......... 1, 12

*Foundation Document: National Mall and Memorial Parks* (Oct. 2017), https://perma.cc/NP6E-JTGR .......... 3

Furqat Sidiqov (@FurqatSidiq), X (Aug. 22, 2026, at 4:56 PM), https://perma.cc/Q2S4-EB2J .......... 1, 11, 21

*History & Culture*, Nat'l Park Serv., https://perma.cc/CK5U-T467 .......... 30, 32

Jacob R. Straus, Cong. Rsch. Serv., IF11937, *Commemorative Works Act: Siting Memorials in the District of Columbia* (2024), https://perma.cc/X6F7-HATM .......... 31

Jacob R. Straus, Cong. Rsch. Serv., R41658, *Commemorative Works in the District of Columbia: Background and Practice* (2023), https://perma.cc/N94N-MS9L .......... 4

Katie Rogers et al., *The Next Phase of Trump's Renovations: A New 'Upper West Wing,'* N.Y. Times (Jan. 8, 2026), https://perma.cc/Z7KF-NKY5 .......... 7

*LIVE: President Trump Delivers Remarks at the Great American State Fair Kickoff Party | NBC News* (YouTube, June 24, 2026), https://www.youtube.com/watch?v=M4HckAX_IxU .......... 10, 28

Luke Broadwater & Zachary Small, *Trump's Vision for 'Garden of Heroes' Keeps Getting Bigger and Higher in Cost*, N.Y. Times (May 3, 2026), https://perma.cc/WZE5-BZ4N .......... 7, 32

Luke Broadwater, *Gazebos from Uzbekistan: The Latest Foreign Gifts in Trump's Washington*, N.Y. Times (Aug. 21, 2026), https://perma.cc/62V5-AACT .......... 11

Nat'l Endowment for the Humanities, *Notice of Funding Opportunity, National Garden of American Heroes: Statues* (May 21, 2025), https://perma.cc/ESJ8-XSTB .......... 7

*National Mall and Memorial Parks: Basic Information*, Nat'l Park Serv., https://perma.cc/KWA7-HVUE .......... 3

*National Park Service Finishes Tidal Basin Seawall Work Early*, Nat'l Park Serv. (Dec. 10, 2025), https://perma.cc/9BN5-6HC6 .......... 13

*National Register of Historic Places Inventory – Nomination Form for East and West Potomac Parks* (July 15, 1972), https://perma.cc/6XYU-3FVG .......... 4

*President Trump Announces $700 Million for Coal Industry* (C-SPAN, June 4, 2026), https://www.c-span.org/program/white-house-event/president-trump-makes-announcement-on-clean-coal/680441 .......... 9, 18

Press Release, *NEH Announces Grant Opportunity to Create Statues of Iconic Americans for the National Garden of American Heroes*, Nat'l Endowment for the Humanities (Apr. 24, 2025), https://perma.cc/CP8L-29QG .......... 7

*Rehabilitate Tidal Basin and West Potomac Park Seawalls, Environmental Assessment*, Nat'l Park Serv. (Feb. 2023), https://perma.cc/W3HH-GJYH .......... 13

Rick Maese & Dan Diamond, *Trump Fundraiser Shares Plans for 'Garden of Heroes,' Golf Course as Takeover Looms*, Wash. Post (May 2, 2026), https://perma.cc/D93M-XEBU .......... 8, 18

Secretary Doug Burgum (@SecretaryBurgum), X (May 15, 2026, at 5:27 PM), https://perma.cc/NK92-CU9K .......... 9, 18, 26, 28

*Shavkat Mirziyoyev Gifts Traditional Uzbek Gazebos to Donald Trump for Washington's West Potomac Park*, Kun.uz (Aug. 24, 2026), https://perma.cc/7MQL-MHR6 .......... 21

Sunlen Serfaty, *Trump Wants a Sculpture Garden for America's 250th Birthday. Sources Say It's Unlikely Even One Statue Will Be Ready*, CNN (Apr. 19, 2026), https://perma.cc/PK88-AU82 .......... 7

## INTRODUCTION

Last month, Defendants told this Court the National Garden of American Heroes was merely a "preliminary concept"—no more than "an idea by the Executive Branch." Dkt. No. 13-1 at 1, 16. But in recent weeks, a flurry of construction activity has broken out at the planned site for the sculpture garden complex in West Potomac Park. That activity includes the installation of gazebos gifted by Uzbekistan in the southeastern corner of the park, while workers dig trenches and pour concrete for walkways in the surrounding area. As the New York Times reported, "about a dozen workers . . . were smoothing freshly poured concrete on a large pedestal that has all the appearances of a permanent new addition to the park." Emily Badger, *Trump's D.C. Makeover Projects Are 'Only an Idea,' Until They're Much More*, N.Y. Times (Sep. 3, 2026), https://perma.cc/JFL3-LGSB.

While Defendants have represented that the gazebos are temporary and not part of the Garden of American Heroes, the Uzbekistan ambassador to the United States has said the opposite, announcing that he was "[p]roud to see Uzbek art become part of the Garden of American Heroes." Furqat Sidiqov (@FurqatSidiq), X (Aug. 22, 2026, at 4:56 PM), https://perma.cc/Q2S4-EB2J. Moreover, the construction activity is occurring in roughly the same area of the park where renderings of the garden complex—posted online by the President and the Secretary of the Interior, and circulated to donors by one of the President's top fundraisers—show structures and walkways. At the very least, these developments undermine Defendants' assertion that "construction has not begun." Dkt. No. 13-1 at 16. And absent judicial intervention, they threaten to render the construction of the garden complex a *fait accompli* before this Court can resolve the merits of Plaintiffs' claims.

To be clear, Defendants' protestations about the "preliminary" nature of this latest vanity project were meritless even a few weeks ago. Plaintiffs' complaint alleges that Defendants have

adopted and begun implementing the "West Potomac Plan" to transform West Potomac Park into a massive garden complex. The plan was already apparent from a pattern of activity that includes public statements made by the President and Secretary Burgum, as well as fundraising efforts by one of the President's associates. But in light of the recent construction, it is even clearer that Plaintiffs' claims are ripe for review.

The West Potomac Plan remains blatantly unlawful. While Defendants insist that this lawsuit is premature, they offer no defense of the plan's legality. Nor could they: Congress decreed in the Commemorative Works Act (CWA) that the "Reserve"—a portion of the National Mall that encompasses West Potomac Park—is a substantially completed work of civic art. Absent congressional authorization, no new commemorative work may be constructed within that area. And as Defendants appear to concede, Congress has not provided the requisite authorization for the garden complex. If that were not enough, another statute provides that "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." 40 U.S.C. § 8106. The West Potomac Plan violates that requirement as well.

Plaintiffs—a D.C. resident who regularly uses West Potomac Park for recreation and a coalition of preservation and cultural heritage organizations committed to preserving open spaces for the use of their members and the public—face substantial and irreparable harm from the transformation of West Potomac Park. The ongoing work has already reduced the open space available in the park, as construction vehicles and equipment occupy areas that park visitors previously used for informal recreation and gatherings. These harms will only worsen, and the potential for future remediation will only lessen, if further construction is allowed to proceed.

Plaintiffs are entitled to a preliminary injunction or 5 U.S.C. § 705 stay to preserve the status quo while this case progresses. That stopgap measure will ensure the Court can grant meaningful relief should Plaintiffs ultimately prevail—lest Defendants claim, as they have in other litigation, that construction is too far along to be halted. Defendants, for their part, face no cognizable harm from an order pausing their unlawful transformation of West Potomac Park. Accordingly, the Court should preliminarily enjoin or stay implementation of the West Potomac Plan and deny Defendants' motion to dismiss.

## BACKGROUND

### I. The National Mall and West Potomac Park are carefully designed for the enjoyment of the public.

The National Mall is "the premier[] civic and symbolic space in our nation." *National Mall and Memorial Parks: Basic Information*, Nat'l Park Serv., https://perma.cc/KWA7-HVUE (last visited June 10, 2026); *see* Compl. ¶ 32. Pierre L'Enfant's original design for the capital city, conceived in 1791, envisioned "open spaces and parklands" that "created an ideal stage for national expressions of remembrance, observance, celebration, and First Amendment rights." *Foundation Document: National Mall and Memorial Parks* 3 (Oct. 2017), https://perma.cc/NP6E-JTGR; *see* Compl. ¶ 33.

In 1897, Congress passed a law reserving East and West Potomac Parks for recreational use, providing that the lands "be, and the same are hereby, made and declared a public park, under the name of the Potomac Park, and to be forever held and used as a park for the recreation and pleasure of the people." Act of Mar. 3, 1897, ch. 375, 29 Stat. 624. A few years after that, the McMillan Commission issued a new plan for the District that reserved the interior of West Potomac Park for recreational use. *East and West Potomac Parks Historic District*, DC Historic Sites, https://perma.cc/LK7B-M2LB (last visited June 10, 2026); Jacob R. Straus, Cong. Rsch.

Serv., R41658, *Commemorative Works in the District of Columbia: Background and Practice* 4 (2023), https://perma.cc/N94N-MS9L; *see* Compl. ¶¶ 37–38.

The early 1900s saw the construction in West Potomac Park of a boat dock, polo fields, and a wooden bandstand, to go along with paths and walkways throughout the park. *National Register of Historic Places Inventory – Nomination Form for East and West Potomac Parks* § 7 (July 15, 1972), https://perma.cc/6XYU-3FVG; *see* Compl. ¶ 40. With the dedication of the Lincoln Memorial in 1922, the basic present layout of West Potomac Park was completed, and all land was in use for recreational purposes. *National Register of Historic Places Inventory* § 7, *supra*; *see* Compl. ¶ 41. Today, the park is a recreational haven for thousands of D.C. residents, including Plaintiff Steve Longenecker and members of Plaintiffs National Parks Conservation Association (NPCA) and the Committee of 100 on the Federal City. *See, e.g.*, Decl. of Steve Longenecker ¶ 3; Decl. of Edward Stierli ¶ 35; Decl. of James Craig Crutchfield ¶¶ 4–5; Decl. of Paul W. Edmondson ¶¶ 5–6; *see also* Bailey Johnson, *It's a D.C. Rec Sports Haven, but Trump Wants It for His 'Heroes' Sculpture Park*, Wash. Post (May 23, 2026), https://perma.cc/Q3VL-XU6G.

## II. Congress establishes a comprehensive process for constructing new monuments.

In 1986, Congress passed and President Reagan signed the Commemorative Works Act to regulate the construction of new monuments in the District. Congress intended that the CWA would, among other things, "ensure the continued public use and enjoyment of open space in the District of Columbia and its environs," and "preserve, protect and maintain the limited amount of open space available to residents of, and visitors to, the Nation's Capital." 40 U.S.C. § 8901(2), (3).

The CWA applies to "commemorative works," defined to include "any statue, monument, sculpture, . . . or other structure or landscape feature, including a garden or memorial

grove, designed to perpetuate in a permanent manner the memory of an individual, group, event or other significant element of American history." *Id.* § 8902(a)(1). The act governs commemorative works "in areas administered by the National Park Service and the Administrator of General Services in the District of Columbia and its environs." *Id.* § 8901(4).

The CWA establishes an intricate process for creating new monuments in the District. For example, when Congress authorizes a commemorative work, it designates a "sponsor" to establish the work. *Id.* § 8902(a)(4). The sponsor must consult with the National Capital Memorial Advisory Commission (NCMAC) regarding potential alternative sites and design concepts. *Id.* § 8905(a)(1). In addition, the Secretary of the Interior or the Administrator of General Services must submit site and design proposals to the Commission of Fine Arts (CFA) and the National Capital Planning Commission (NCPC) for their approval. *Id.* § 8905(a)(2). Generally, a commemorative work may not be authorized until after the twenty-fifth anniversary of the event or death of the individual being commemorated. *Id.* § 8903(c).

Congress amended the CWA in 2003 to make the process even more restrictive for certain parts of the National Mall. In particular, Congress created the "Reserve," encompassing "the great cross-axis of the Mall, which generally extends from the United States Capitol to the Lincoln Memorial, and from the White House to the Jefferson Memorial." *Id.* § 8902(a)(3). Congress found that the Reserve "is a substantially completed work of civic art." Commemorative Works Clarification and Revision Act of 2003, Pub. L. No. 108-126, § 202(a)(1), 117 Stat. 1348, 1349 (codified at 40 U.S.C. § 8901 note). After November 17, 2003, "no commemorative work or visitor center shall be located within the Reserve." 40 U.S.C. § 8908(c). West Potomac Park is within the Reserve. *Commemorative Areas Washington, DC and Environs (Map Number 869/86501 B)*, Nat'l Park Serv. (June 24, 2003), https://perma.cc/NS43-RCZ3; *see* Compl. ¶¶ 50, 137.

Other statutes also restrict the construction of monuments and memorials in the District of Columbia. Under 40 U.S.C. § 8106, for example, "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress."

**III. The first and second Trump administrations develop plans for a sculpture garden.**

In July 2020, President Trump signed an executive order titled "Building and Rebuilding Monuments to American Heroes," announcing that it would be the policy of the United States "to establish a statuary park named the National Garden of American Heroes." Exec. Order No. 13934, § 3(a), 85 Fed. Reg. 41165 (July 3, 2020). The order provided an initial list of thirty-one figures whose statues would be included in the garden. *Id.* § 3(c)(i). The order said the garden "should be opened for public access prior to . . . July 4, 2026." *Id.* § 3(c)(ii).

Just before the end of his first term, President Trump signed another executive order titled "Building the National Garden of American Heroes." Exec. Order No. 13978, 86 Fed. Reg. 6809 (Jan. 18, 2021). The order added hundreds of additional names to the previous list, bringing the total to 244 figures—including several individuals who died within the last twenty-five years. *Id.* § 3(b). The order directed the Secretary of the Interior to "identify a site suitable for the establishment of the National Garden" and to "proceed with construction of the National Garden at that site." *Id.* § 4(a). On May 14, 2021, President Biden revoked both of these executive orders. Exec. Order No. 14029, 86 Fed. Reg. 27025 (May 14, 2021).

On January 29, 2025, President Trump reinstated them in an executive order titled "Celebrating America's 250th Birthday." Exec. Order No. 14189, 90 Fed. Reg. 8849 (Jan. 29, 2025). The order directed the Assistant to the President for Domestic Policy to "recommend to the President additional historically significant Americans for inclusion in the National Garden of

American Heroes, to bring the total number of heroes to 250." *Id.* § 3(b). It further ordered that the garden should be opened to the public "as expeditiously as possible." *Id.* § 3(c).

In April 2025, the National Endowment for the Humanities announced a grant program to support the garden, requesting "preliminary concepts" and offering awards of up to $200,000 per statue. Press Release, *NEH Announces Grant Opportunity to Create Statues of Iconic Americans for the National Garden of American Heroes*, Nat'l Endowment for the Humanities (Apr. 24, 2025), https://perma.cc/CP8L-29QG. According to the notice of funding opportunity, statues "should be in the classical style, lifelike, and created from marble, granite, bronze, copper, or brass." Nat'l Endowment for the Humanities, *Notice of Funding Opportunity, National Garden of American Heroes: Statues* 6 (May 21, 2025), https://perma.cc/ESJ8-XSTB. Standing figures must be at least six-and-a-half feet tall, while seated figures must be at least five feet tall, and all sculptures must plan for a pedestal at least three feet tall. *Id.* The notice called for statues to be "completed and delivered by June 1, 2026." *Id.* at 2; *see* Compl. ¶¶ 81–83.

In January 2026, President Trump said the garden was "going to be most likely right on the Potomac River. . . . That hasn't been a final decision, but it's getting close." Katie Rogers et al., *The Next Phase of Trump's Renovations: A New 'Upper West Wing,'* N.Y. Times (Jan. 8, 2026), https://perma.cc/Z7KF-NKY5; *see* Compl. ¶ 85. By April 2026, the administration had zeroed in on West Potomac Park and hired an architect to advise the project. Sunlen Serfaty, *Trump Wants a Sculpture Garden for America's 250th Birthday. Sources Say It's Unlikely Even One Statue Will Be Ready*, CNN (Apr. 19, 2026), https://perma.cc/PK88-AU82; *see* Compl. ¶ 87. Plans for the project have steadily grown "larger" and "more expensive," now including formal gardens, reflecting pools, plazas, dining facilities, and an amphitheater alongside the statues. Luke Broadwater & Zachary Small, *Trump's Vision for 'Garden of Heroes' Keeps Getting Bigger and Higher in Cost*, N.Y. Times (May 3, 2026), https://perma.cc/WZE5-BZ4N; *see* Compl. ¶ 90.

A top fundraiser for President Trump has already begun seeking donations for the garden complex on behalf of the "National Garden of American Heroes Foundation." Rick Maese & Dan Diamond, *Trump Fundraiser Shares Plans for 'Garden of Heroes,' Golf Course as Takeover Looms*, Wash. Post (May 2, 2026), https://perma.cc/D93M-XEBU; *see* Ex. A (Garden Fundraising Agreement); Compl. ¶ 93. The pledge agreement states that in 2026, the foundation "will launch two landmark initiatives that embody its mission to honor America's 250th anniversary through lasting national investment." Garden Fundraising Agreement at 9. One of those initiatives is "the development of The National Garden of American Heroes at West Potomac Park—a transformative project." *Id.* The pledge agreement provides directions for donors to make a "binding commitment of payment," including wiring instructions. *Id.* at 10, 12. And it states that gifts "will be used" to support the foundation and its "founding projects," specifically including the garden complex. *Id.* at 10.

The pledge agreement features renderings showing how the project will transform West Potomac Park and dramatically impair—if not eliminate altogether—its recreational qualities, including by removing the softball fields, diminishing other open grassy areas currently free for formal and informal recreational sports, and curtailing the space available to bicyclists. The renderings also illustrate that the garden complex will be situated near the FDR and MLK memorials. And consistent with reports on the expansive plans for the complex, the renderings show that it will have multiple buildings and structures, including not only statues but also dining facilities and other features. *Id.* at 3–8; *see* Compl. ¶ 96.

**IV. Defendants adopt and begin to implement the West Potomac Plan.**

Defendants made a final decision to adopt the West Potomac Plan no later than May 15, 2026, as revealed by President Trump's posting on social media:

> I am proud to announce the site of the NATIONAL GARDEN OF AMERICAN HEROES. This magnificent exhibition of statues will be located in West Potomac

> Park, which we are transforming into one of the World's most beautiful public spaces. Right now, it is a totally BARREN field of Prime Waterfront Real Estate along our Mighty Potomac River. When finished, West Potomac Park will be a World Class Masterpiece with elegant Landscaping, and adorned with Beautiful Statues, and be yet another one of my great projects to make Washington, D.C., the Safest and Most Beautiful Capital in the World. The National Garden of American Heroes will feature the MOST BEAUTIFUL collection of statues of AMERICAN HEROES, featuring our illustrious Founding Fathers, Military Warriors, Religious Leaders, Civil Rights Champions, World Class Athletes, Artists, Entertainers, and MORE. The people of America (and the World!) will come here to learn and be inspired by the "Greats". The National Garden of American Heroes is one more project we are undertaking to honor the 250th Birthday of the Greatest Nation on Earth, THE UNITED STATES OF AMERICA!

Donald J. Trump (@realDonaldTrump), Truth Social (May 15, 2026, at 4:52 AM), https://perma.cc/M6W9-TUF2. The President also shared a rendering of the project similar to the ones in the pledge agreement. *Id.*; *see* Compl. ¶¶ 100–01.

Secretary Burgum posted the same image and stated: "As America approaches its 250th birthday, @POTUS is continuing to honor our nation's legacy with the National Garden of American Heroes, a landmark in Washington, D.C. that will be enjoyed for generations to come." Secretary Doug Burgum (@SecretaryBurgum), X (May 15, 2026, at 5:27 PM), https://perma.cc/NK92-CU9K. Secretary Burgum's announcement of West Potomac Park as the site of the garden complex was definitive and not conditioned on congressional approval or other further steps. *See* Compl. ¶¶ 102–03. The President selected Michael Curtis as the lead designer for the garden complex, and the design team also includes two architects, a sculptor, and an urban planner. Dan Diamond, *Trump Announces Planned D.C. Site for Massive Sculpture Garden*, Wash. Post (May 15, 2026), https://perma.cc/L3MY-WN9P; *see* Compl. ¶ 105.

During an Oval Office announcement on June 4, 2026, the President stated that "the National Garden of American Heroes is going to be unbelievable" and told Secretary Burgum, "I'd like to know how are you doing on that and how are you doing on the great triumphal arch." *President Trump Announces $700 Million for Coal Industry*, at 22:02–26:08 (C-SPAN, June 4,

2026), https://www.c-span.org/program/white-house-event/president-trump-makes-announcement-on-clean-coal/680441. The President explained that "we're doing [the arch] with the Department of Interior and we're also doing the National Garden of American Heroes, which is phenomenal." *Id.* In response, Secretary Burgum stated: "The views from this side, from West Potomac where the National Garden of Heroes was, looking across at the arch would be amazing." *Id.* Secretary Burgum linked the projects to "the celebration of our 250th anniversary" and said the "vision that [the President] has for these projects would extend for generations forward." *Id.*; *see* Compl. ¶¶ 106–09.

A few weeks later, the President spoke at the National Mall as part of the kickoff for the Great American State Fair. He stated: "In West Potomac Park, we are creating the National Garden of American Heroes featuring 250 or more statues of the greatest Americans who have ever lived." *LIVE: President Trump Delivers Remarks at the Great American State Fair Kickoff Party | NBC News*, at 56:34–47 (YouTube, June 24, 2026), https://www.youtube.com/watch?v=M4HckAX_IxU.

In July 2026, the Park Service issued a request for qualifications and scope of work for a "Tidal Basin Redevelopment Plan." Ex. B (Tidal Basin Request for Qualifications); Ex. C (Tidal Basin Scope of Work). The stated purpose of the project is to revise the "master plan" for the Tidal Basin area, which was originally issued in January 2026. Tidal Basin Scope of Work at 1. The Park Service explained that the contractor selected would prepare "a revised preferred alternative" combining part of the work "from the eastern portion of the January 2026 Tidal Basin Plan with a drawing provided by the government for the western portion of the project area." *Id.* at 2. The contractor "shall remove from the alternative all proposed design elements located west of the Inlet Bridge and the Kutz Bridge"—that is, the area in West Potomac Park where the renderings show the garden complex will be located—"and replace those elements

with the concept drawing provided by the Government." *Id.* at 8. And "[t]he Government-provided drawing represents the design direction for the western portion of the project area." *Id.*; *see also id.* (stating that the contractor "shall not materially alter the Government-provided design direction without prior written approval"). A government website indicates that the contract was awarded on August 24, 2026. *See C--NAMA 245076 - Tidal Basin Redevelopment Plan*, SAM.gov, https://perma.cc/P67C-RL5K (last visited Sep. 13, 2026).

**V. Construction activity breaks out at West Potomac Park.**

On August 21, the New York Times reported that "Uzbek gazebos will be exhibited in West Potomac Park, the site of Mr. Trump's planned National Garden of American Heroes." Luke Broadwater, *Gazebos from Uzbekistan: The Latest Foreign Gifts in Trump's Washington*, N.Y. Times (Aug. 21, 2026), https://perma.cc/62V5-AACT. The Interior Department communications director stated: "Visitors to West Potomac Park will be able to enjoy the exquisitely crafted aywans later this fall." *Id.* The next day, the Uzbekistan ambassador to the United States posted on social media: "Proud to see Uzbek art become part of the Garden of American Heroes in Washington, D.C." Furqat Sidiqov (@FurqatSidiq), X, *supra*.

As of August 29, construction activity was under way in a large area of the southeastern corner of West Potomac Park that had previously been fenced off for other work. Stierli Decl. ¶ 43. Within that area, concrete was poured for gazebos and walkways, while trenches were dug for lighting. *Id.* ¶ 44. By September 2, significant construction work was ongoing within the fenced area. *Id.* ¶ 45; *see also* David A. Fahrenthold et al., *Who Approves Trump's Washington Makeover Projects?*, N.Y. Times (Sep. 2, 2026), https://perma.cc/9QTC-2CL7 (reporting that work was "underway at the site," with workers "building 'exquisitely crafted' gazebos . . . for the [Garden of Heroes] project"). Construction vehicles and equipment were staged at the park, with crews actively pouring and finishing concrete. Stierli Decl. ¶ 45. In addition to concrete bases

for the gazebos, crews were preparing concrete walkways leading to the pavilion sites and connecting to the sidewalk along Ohio Drive. *Id.* This ongoing construction work "has all the appearances of a permanent new addition to the park," as shown below:



Badger, *Trump's D.C. Makeover Projects*, https://www.nytimes.com/2026/09/03/upshot/trump-dc-mall-garden-heroes.html, *supra*.

These developments have already interfered with the recreational features of West Potomac Park. Stierli Decl. ¶ 47. The "construction area, the staged vehicles and equipment, and the newly poured concrete occupy open lawn that, in the past, park visitors and NPCA staff have used for informal recreation and gatherings." *Id.* This portion of the park thus "is not available for recreational purposes." *Id.*[1]

[1] The same area was previously fenced off as part of ongoing construction related to a seawall restoration project. Stierli Decl. ¶ 43. But that project was completed in December 2025, and the Park Service announced then that the area was expected to reopen shortly after the cherry blossom festival in spring 2026. *National Park Service Finishes Tidal Basin Seawall Work Early*, Nat'l Park Serv. (Dec. 10, 2025), https://perma.cc/9BN5-6HC6; *see also Rehabilitate*

## ARGUMENT

### I. Plaintiffs are entitled to a preliminary injunction or 5 U.S.C. § 705 stay.

To obtain a preliminary injunction, "the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The same standard applies to obtain a stay under 5 U.S.C. § 705. *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020).

All four factors are satisfied here. Plaintiffs are likely to establish standing to challenge the West Potomac Plan, which causes them recreational, aesthetic, procedural, and informational harms. The plan constitutes reviewable final agency action because Defendants have made a decision to construct the garden complex in West Potomac Park, and Plaintiffs need not wait until the last statue is installed to challenge that decision. On the merits, the West Potomac Plan is patently unlawful under the Commemorative Works Act and 40 U.S.C. § 8106. And the equitable factors weigh decidedly in favor of preliminary relief: Plaintiffs face irreparable harm if construction of the garden complex is allowed to proceed absent compliance with required statutory processes, while Defendants will suffer no harm from pausing implementation of the plan to ensure that meaningful relief remains available should Plaintiffs prevail.

---

*Tidal Basin and West Potomac Park Seawalls, Environmental Assessment* 38, Nat'l Park Serv. (Feb. 2023), https://perma.cc/W3HH-GJYH ("Once the construction process is complete, the entire project area would be restored and reopened to visitors.").

**A. Plaintiffs are likely to demonstrate standing.**

At the outset, Plaintiffs have standing to challenge the West Potomac Plan. To establish standing, a plaintiff must show an injury in fact that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; a "causal connection between the injury and the conduct complained of"; and that the injury likely will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted). Plaintiffs have made a "clear showing" that they are "likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (internal quotation marks and citation omitted).[2]

**1. The West Potomac Plan harms Mr. Longenecker and members of NPCA and the Committee of 100.**

The West Potomac Plan harms the recreational and aesthetic interests of Mr. Longenecker and members of NPCA and the Committee of 100. "It is well established that environmental plaintiffs adequately allege standing 'when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.'" *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 144 F.4th 296, 305 (D.C. Cir. 2025) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000)). Mr. Longenecker has standing on this basis. And NPCA and the Committee of 100 have associational standing because (1) "[their] members would otherwise have standing to sue in their own right"; (2) "the interests [they] seek[] to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires

[2] The Court "need only find one plaintiff who has standing." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014).

the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

As the declarations of Mr. Longenecker and NPCA and Committee of 100 members show, those individuals' recreational and aesthetic interests are harmed by the West Potomac Plan. Mr. Longenecker, for example, has been playing ultimate frisbee at West Potomac Park on a weekly basis for more than a decade. Longenecker Decl. ¶ 3. The field's features make it convenient for him to bring his daughter, who has a developmental disability, to the weekly games, as he has been doing since she was an infant. *Id.* ¶ 8. These Saturday games at the park "have been a staple of [his] family's weekends." *Id.* ¶ 10.

West Potomac Park is also a "special place" for NPCA employee and member Edward Stierli. Stierli Decl. ¶ 34. Mr. Stierli has been regularly visiting West Potomac Park since 2010, and he proposed to his wife there in 2011. *Id.* He frequently brings his children to the park, where they take advantage of its open spaces to play pickup sports, picnic, and take in the scenery of the Mall away from the crowds that surround other areas. *Id.* ¶¶ 35–36. Mr. Stierli often visits the park in his professional capacity as well, attending rallies and giving tours hosted by NPCA. *Id.* ¶¶ 38–39.

In addition, NPCA member James Craig Crutchfield and Committee of 100 member Paul W. Edmondson regularly take advantage of the park for biking. Mr. Crutchfield bikes there at least once a month, enjoying "the scenic views of the Potomac River and the Mall." Crutchfield Decl. ¶¶ 4–5. He also visits the nearby FDR and MLK memorials, which he finds "particularly special" because of their "isolation and serenity." *Id.* ¶ 6. Similarly, Mr. Edmondson bikes in West Potomac Park approximately half a dozen times a year, on average, often stopping to visit

the FDR and MLK memorials and "enjoy the more peaceful and contemplative setting." Edmondson Decl. ¶¶ 5–7.

For each of these individuals, the West Potomac Plan would disrupt and detract from their enjoyment of West Potomac Park. As Mr. Longenecker explains, the transformation of the park into a garden complex would take away the longstanding location of his weekly ultimate frisbee game. Longenecker Decl. ¶ 13. As a result, "[a]n experience that has been so important to [him] and [his] family would be greatly diminished or eliminated completely." *Id.* The West Potomac Plan likewise would make it "far more difficult, if not impossible," for Mr. Stierli and his family "to enjoy the park's open spaces." Stierli Decl. ¶ 40; *see also id.* ¶ 41 ("The construction of the garden complex would fundamentally change and detract from the way we visit and experience the Mall by diminishing the open space in West Potomac Park and crowding it with statues and other structures."). For Mr. Crutchfield, the garden complex would make biking more difficult and less enjoyable because it would increase crowds in the area, bringing a greater risk of bicycle, pedestrian, and automobile collisions. Crutchfield Decl. ¶ 11. The same is true for Mr. Edmondson, who would spend "significantly less time, if any," biking in the park due to the West Potomac Plan. Edmondson Decl. ¶ 11. And the increased crowding stemming from construction of the garden complex would detract from their enjoyment of the serenity and isolation of the MLK and FDR memorials. Crutchfield Decl. ¶ 12; Edmondson Decl. ¶ 12.

In sum, each individual attests that he "use[s] the affected area" and is someone "for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.'" *See Ctr. for Biological Diversity*, 144 F.4th at 305 (citation omitted). The Supreme Court and the D.C. Circuit have repeatedly held that similar injuries establish standing. *See, e.g.*, *Friends of the Earth*, 528 U.S. at 181–83 (holding that individuals showed injury where

challenged pollution interfered with their recreational activities in and around river); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1158 (D.C. Cir. 2025) (finding standing where rule threatened individual's "ability to see and enjoy" endangered beetle in natural habitat); *Int'l Dark-Sky Ass'n v. FCC*, 106 F.4th 1206, 1217 (D.C. Cir. 2024) (concluding that members whose "aesthetic and recreational activities will be inhibited by light pollution" alleged injury); *Cal. Cmtys. Against Toxics v. EPA*, 928 F.3d 1041, 1049 (D.C. Cir. 2019) (finding standing where reasonable fear of health and environmental risks reduced petitioners' enjoyment of outdoor activities); *Sierra Club v. Jewell*, 764 F.3d 1, 6 (D.C. Cir. 2014) (holding that members had "concrete interests in appreciating and studying the aesthetic features and historical significance of a preserved and intact Battlefield," which was threatened by mining); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) (noting government had conceded standing based on member's "interests in viewing the flora and fauna of the area").

The Supreme Court's recent emergency docket ruling in *National Park Service v. National Trust for Historic Preservation* (*National Trust for Historic Preservation IV*), No. 26A203, 2026 WL 2564318 (U.S. Aug. 31, 2026) (per curiam), only confirms that conclusion. There, the Court emphasized that "to secure standing a plaintiff must identify some concrete and particularized injury 'other than the psychological consequence presumably produced by observation of conduct with which one disagrees.'" *Id.* at *2 (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982)). Plaintiffs have done just that: their injuries do not stem from the anticipated visual offensiveness of the garden complex, but rather from the elimination of open space previously available for recreation and used by Plaintiffs and their members for that purpose. *E.g.*, Longenecker Decl.

¶ 13; Stierli Decl. ¶ 40; Crutchfield Decl. ¶ 10; Edmondson Decl. ¶ 11. They are similarly situated to plaintiffs who had standing where they had to abandon activities such as swimming and picnicking or otherwise suffered injuries to their recreational interests because of defendants' actions. *See Nat'l Tr. for Historic Pres. IV*, 2026 WL 2564318, at *2 (discussing *Friends of the Earth* and *Summers*).

Defendants' motion to dismiss does not challenge the legal sufficiency of Plaintiffs' recreational and aesthetic interests in West Potomac Park. Instead, they insist that any asserted injuries are too speculative because "the Garden is only an idea." Dkt. No. 13-1 at 16. But future injury can establish standing "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks and citation omitted); *see also, e.g.*, *Attias v. CareFirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017) ("Since [*Susan B. Anthony List*], we have frequently upheld claims of standing based on allegations of a 'substantial risk' of future injury."). On multiple occasions, Secretary Burgum has publicly announced or referenced Defendants' decision to transform West Potomac Park into a garden complex. Secretary Doug Burgum (@SecretaryBurgum), X, *supra*; *President Trump Announces $700 Million for Coal Industry*, *supra*; *see* Compl. ¶¶ 102, 108–09. One of the President's top fundraisers has also begun soliciting "binding commitment[s] of payment" that "will be used" to support the project, providing detailed renderings. Garden Fundraising Agreement at 10; Maese & Diamond, *Trump Fundraiser Shares Plans for 'Garden of Heroes,' supra*; *see* Compl. ¶¶ 93–98. And repeated statements from the President himself further confirm that Defendants have adopted the West Potomac Plan. Donald J. Trump (@realDonaldTrump), Truth Social, *supra*; *President Trump Announces $700 Million for Coal Industry*, *supra*; *see* Compl. ¶¶ 100–01, 106–07; *see also* Exec.

Order No. 14189, § 3(c) (directing that garden should be opened to public "as expeditiously as possible").[3]

Against the backdrop of all this evidence, Plaintiffs need not wait for Defendants to break ground to establish standing. To hold otherwise would heighten the imminence requirement beyond recognition. *See, e.g.*, *Jibril v. Mayorkas*, 20 F.4th 804, 817 (D.C. Cir. 2021) ("A plaintiff is not required to wait for an injury to occur in order to satisfy Article III standing requirements."). Defendants intend to turn West Potomac Park into a garden complex, and that transformation will harm Plaintiffs' recreational and aesthetic interests. *E.g.*, Longenecker Decl. ¶ 13; Stierli Decl. ¶ 40. The imminence of the harm is heightened, moreover, because the government has repeatedly undertaken construction projects without advance notice. *See* Compl. ¶¶ 123–28 (collecting examples of Trump administration "mov[ing] quickly to undertake renovation projects without any notice or opportunity for public comment under processes required by law"). At the very least, Plaintiffs have shown a substantial risk of future injury from the West Potomac Plan. *See, e.g.*, *In re Idaho Conservation League*, 811 F.3d 502, 509 (D.C. Cir. 2016) (member showed mining projects threatened future enjoyment of wilderness, even where one project was "still in the planning stage," because record established that "the mine is likely to go forward even though it is not yet complete" and that "the mining company has concrete plans to proceed"); *Sierra Club*, 764 F.3d at 8 (finding imminent injury because companies' stated expectations of development, coupled with their mining operations nearby, established "substantial probability" of mining in battlefield site).

[3] Defendants assert that Plaintiffs are not harmed by Secretary Burgum's "social media post and remarks to the press," Dkt. No. 13-1 at 14, but no one argues otherwise. The point is that the post and remarks are evidence of Defendants' adoption of the West Potomac Plan—the agency action from which Plaintiffs' injuries stem.

There is no uncertainty as to whether the garden complex will interfere with Plaintiffs' use of West Potomac Park. *Contra* Dkt. No. 13-1 at 17. The President has described the park as a "BARREN field" and announced that it will be "transform[ed]." Donald J. Trump (@realDonaldTrump), Truth Social, *supra*. That transformation will plainly interfere with recreational use of the park, as well as enjoyment of nearby memorials. *E.g.*, Longenecker Decl. ¶ 13; Stierli Decl. ¶ 40; Crutchfield Decl. ¶ 13; Edmondson Decl. ¶¶ 11–12. And detailed renderings—shared by the President and Secretary Burgum, and circulated to potential donors—illustrate what the transformation will look like: softball fields will be removed; other open grassy areas will be substantially diminished; and the space available to bicyclists will be curtailed. Garden Fundraising Agreement at 3–8; *see* Compl. ¶ 96. The renderings also indicate that the garden complex will be adjacent to the FDR and MLK memorials and that—consistent with public reporting—it will have multiple buildings and structures, including not only statues but also dining facilities and other features. Garden Fundraising Agreement at 3–8; *see* Compl. ¶¶ 90, 96. All these changes will impede Plaintiffs' recreational and aesthetic interests in West Potomac Park.

Plaintiffs' harms therefore do not rest on a "speculative chain of possibilities." Dkt. No. 13-1 at 17 (citation omitted). Defendants have decided to transform West Potomac Park into a garden complex, and Plaintiffs face a substantial risk of harm from that decision. On Defendants' account, Plaintiffs apparently would not suffer Article III injury until construction of the garden complex is substantially or entirely complete. Of course, at that point, the government is likely to argue—as it has in other litigation—that the project is too far along for Plaintiffs' injuries to be redressed. *See* Brief for Appellants/Cross-Appellees at 27 n.4, *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.* (*Nat'l Tr. for Historic Pres. III*), No. 26-5123 (D.C. Cir.

May 7, 2026) ("Insofar as Hoagland claims injury because she can no longer observe the old East Wing, any such harms are no longer redressable given that the demolition has already occurred and cannot be undone."); Oral Argument at 16:52, *Nat'l Tr. for Historic Pres III*, No. 26-5123 (D.C. Cir. June 5, 2026) (government counsel arguing that if White House were already bulldozed, any injury would be non-redressable); *see also* Application for Stay at 34, *Nat'l Tr. for Historic Pres. IV*, No. 26A203 (U.S. Aug. 13, 2026) (government asserting that it would be "a disaster" and "beyond impractical" to stop work on ballroom "ten months into construction" (citation omitted)). This Court should not embrace that paradoxical view of standing.

If any more were needed, recent developments underscore that Plaintiffs' harms are imminent. Construction crews have begun assembling gazebos, digging trenches, and pouring concrete for walkways in the southeastern corner of West Potomac Park. Stierli Decl. ¶¶ 43–45. That ongoing work aligns with publicly available renderings of the garden complex, and it reduces the park's recreational space, as "[t]he construction area, the staged vehicles and equipment, and the newly poured concrete occupy open lawn that, in the past, park visitors and NPCA staff have used for informal recreation and gatherings." *Id.* ¶ 47.

In a meet-and-confer, counsel for Defendants represented that the Uzbek gazebos currently under construction are not part of the Garden of American Heroes. That explanation conflicts with the understanding of the Uzbekistan ambassador, who said his country had gifted the gazebos as "part of the Garden of American Heroes." Furqat Sidiqov (@FurqatSidiq), X, *supra*; *see also Shavkat Mirziyoyev Gifts Traditional Uzbek Gazebos to Donald Trump for Washington's West Potomac Park*, Kun.uz (Aug. 24, 2026), https://perma.cc/7MQL-MHR6. The renderings of the garden complex, moreover, feature structures and walkways in the southeastern corner of the park, *see* Garden Fundraising Agreement at 6—the same location

where the ongoing construction is taking place, including not only the gazebos but also the beginnings of concrete structures and walkways, Stierli Decl. ¶¶ 43–45. The recent activity at the park undermines Defendants' claim that "construction has not begun" on the garden complex, Dkt. No. 13-1 at 16, and it further illustrates that Plaintiffs' recreational and aesthetic injuries are sufficiently imminent.

Defendants do not challenge the remaining standing requirements. Plaintiffs' injuries are traceable to the West Potomac Plan, and a favorable decision would redress those injuries by blocking further implementation of the plan. Mr. Longenecker, NPCA, and the Committee of 100 thus have standing to challenge the West Potomac Plan based on recreational and aesthetic injuries.[4]

**2. The West Potomac Plan harms the organizational plaintiffs.**

The organizational plaintiffs have standing in their own right based on Defendants' failure to follow required procedures before adopting and implementing the West Potomac Plan. Each organizational plaintiff participates in review processes for projects—like the proposed garden complex—that affect public spaces. Stierli Decl. ¶¶ 9–11; Decl. of Rebecca Miller ¶¶ 8–9; Decl. of Judy Scott Feldman ¶ 7; Decl. of Sue Breitkopf ¶ 7; Decl. of Judy Chesser ¶¶ 5–24; Decl. of Charles A. Birnbaum ¶ 12. Each organizational plaintiff also has longstanding interests in West Potomac Park and would have participated in review processes concerning the transformation of the park into a garden complex. Stierli Decl. ¶¶ 12–17, 22–29; Miller Decl.

[4] The other requirements for associational standing are satisfied as well. The interests asserted by NPCA and the Committee of 100 are germane to their organizational purposes because this suit is intended to prevent the unlawful transformation of West Potomac Park, a historically significant site and treasured public space. Stierli Decl. ¶ 50; Decl. of Judy Chesser ¶ 55. And "the purely injunctive and declaratory relief" requested "does not require the participation of individual members either to litigate or to remediate the claim[s]." *Ctr. for Biological Diversity*, 146 F.4th at 1157 (D.C. Cir. 2025).

¶¶ 10–14, 20–27; Feldman Decl. ¶¶ 8–10, 15–22; Breitkopf Decl. ¶¶ 8–10, 15–20; Chesser Decl. ¶¶ 25–40, 45–50; Birnbaum Decl. ¶¶ 13–15, 21–27.

Defendants have failed to follow those mandatory processes. Under the Commemorative Works Act, for example, proposals for the garden complex should have been submitted to the NCMAC, the NCPC, and the CFA. 40 U.S.C. § 8905(a)(1), (2). Defendants also should have initiated review processes pursuant to the NHPA and NEPA. *See* 54 U.S.C. § 306108; 42 U.S.C. § 4332. If Defendants had done so, the organizational plaintiffs could have shared their concerns and expert knowledge about the West Potomac Plan's impact on the park and the public. Stierli Decl. ¶¶ 22–29; Miller Decl. ¶¶ 20–27; Feldman Decl. ¶¶ 15–22; Breitkopf Decl. ¶¶ 15–20; Chesser Decl. ¶¶ 45–50; Birnbaum Decl. ¶¶ 21–27. Defendants' failure to initiate those processes before adopting and implementing the plan—along with their failure to provide information about the plan—has caused procedural and informational injuries that confer standing. *See People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (finding standing where agency's inaction "precluded" organizational plaintiff from pursuing its mission through "normal process" and deprived it of "key information" (citation omitted)); *Nat. Res. Def. Council, Inc. v. Jamison*, 787 F. Supp. 231, 237 (D.D.C. 1990) (noting that courts "have recognized agency violations of procedural rights as constituting injury-in-fact to associations for which such procedures fulfill necessary organizational goals"); *see also Sierra Club v. FERC*, 827 F.3d 36, 43 (D.C. Cir. 2016) (explaining that agency's failure to complete adequate NEPA review "constitutes the 'archetypal procedural injury' redressable under Article III" (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013))).

Defendants mischaracterize these harms as based on a failure to follow required procedures "before publicly commenting on the Garden." Dkt. No. 13-1 at 14–15. Plaintiffs do not argue that *commenting* on a potential sculpture garden—as the President did in his first term, Compl. ¶ 66, and then again early this year, *id.* ¶ 85—triggers the requirements of the NHPA, NEPA, or other statutes. Instead, the crux of Plaintiffs' challenge is that Defendants did not comply with required procedures before *deciding* to transform West Potomac Park into a garden complex. *See Am. Tunaboat Ass'n v. Ross*, 391 F. Supp. 3d 98, 109 (D.D.C. 2019) (recognizing procedural injury based on loss of "time and opportunity to influence agency decisionmakers before they commit to a course of action"); *see also Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989) (Breyer, J.) ("It is far easier to influence an initial choice than to change a mind already made up." (citation omitted)). The resulting procedural and informational injuries to the organizational plaintiffs establish standing.[5]

**B. Plaintiffs are likely to succeed on the merits.**

**1. The West Potomac Plan is final agency action.**

As a threshold matter, the West Potomac Plan is reviewable "agency action." *Contra* Dkt. No. 13-1 at 21–22. Under the APA, agency action "cover[s] comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). That includes a "rule," which is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe

---

[5] Defendants' claim that Plaintiffs allege "a risk of future procedural harms" fails for the same reasons. Dkt. No. 13-1 at 16. The procedural harms are ongoing because Defendants have adopted and begun to implement the West Potomac Plan without following the necessary procedures. That reality also defeats Defendants' halfhearted contention that any procedural injuries are unduly speculative because "White House officials have previously said they will follow 'all legal requirements and approvals' for the planned garden." *Id.* (quoting Diamond, *Trump Announces Planned D.C. Site*, *supra*).

law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). The West Potomac Plan easily fits within this "broad definition," *Cent. Tex. Tel. Coop., Inc. v. FCC*, 402 F.3d 205, 211 (D.C. Cir. 2005), because it is designed to implement and prescribe a new policy for West Potomac Park.[6]

Plaintiffs need not identify a "decision document" approving the garden complex's design or construction. *Contra* Dkt. No. 13-1 at 22. The D.C. Circuit has made clear that an agency's decision "need not be committed to writing to be final and judicially reviewable." *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020). Here, the undisputed facts, including public statements from the President and the Secretary of the Interior, indicate that Defendants have made a decision to turn West Potomac Park into a garden complex. Defendants cannot evade judicial review of that decision by declining to write it down in a single document. *See, e.g.*, *Hennepin County v. HHS*, No. 26-cv-2460, 2026 WL 2426300, at *7 (D.D.C. Aug. 19, 2026) (agency cannot "insulate its decisions from APA review by simply refusing to write them down").

Defendants suggest that a "plan" is categorically unreviewable, Dkt. No. 13-1 at 22, but the cases they cite involved nothing like the agency action here. In *Independent Equipment Dealers Ass'n v. EPA*, 372 F.3d 420 (D.C. Cir. 2004), the challenged EPA letter "merely restated in an abstract setting" the agency's "longstanding interpretation" of certain regulations. *Id.* at 427. The letter "was purely informational in nature" and "left the world just as it found it." *Id.*

[6] Alternatively, the West Potomac Plan would qualify as an "order," defined under the APA as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making." 5 U.S.C. § 551(6). This "broad definition" encompasses "virtually any authoritative agency action other than a rule." *Drs. for Am. v. Off. of Pers. Mgmt.*, 766 F. Supp. 3d 39, 50 (D.D.C. 2025) (quoting *N.Y. Stock Exch. LLC v. SEC*, 2 F.4th 989, 992 (D.C. Cir. 2021)).

at 427–28. Similarly, the "strategic plan" at issue in *Fund for Animals v. Williams*, 391 F. Supp. 2d 132 (D.D.C. 2005), published "a long-term goal." *Id.* at 137. The West Potomac Plan, by contrast, does not merely restate an agency position or announce goals—it constitutes a decision to transform the park into a garden complex that will "displace the park's existing open spaces and recreational fields." Compl. ¶ 4. That agency action is reviewable under the APA.[7]

The West Potomac Plan is also "final." 5 U.S.C. § 704. Final agency actions are those that mark "the consummation of the agency's decisionmaking process" and "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks and citation omitted). Courts take a "pragmatic" approach to finality. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (citation omitted).

Both prongs of the *Bennett* test are satisfied. First, the West Potomac Plan marks the consummation of Defendants' decisionmaking process. On May 15, Secretary Burgum announced Defendants' decision to construct the garden complex in West Potomac Park. Secretary Doug Burgum (@SecretaryBurgum), X, *supra*; *see* Compl. ¶ 102. That announcement was not conditioned on any future developments or congressional approval—even though such approval is required by the CWA and 40 U.S.C. § 8106. *See* Compl. ¶ 103. Defendants' decisionmaking process has ended: by their own admission, the garden complex "will" be built in West Potomac Park. Secretary Doug Burgum (@SecretaryBurgum), X, *supra*; *see* Compl. ¶ 102.

[7] Defendants maintain that Secretary Burgum's social media post and public remarks do not constitute agency action. Dkt. No. 13-1 at 22. Again, Plaintiffs do not argue otherwise. *See supra* note 3. While the relevant agency action here is the West Potomac Plan, the Secretary's post and remarks evince Defendants' adoption of that plan.

Second, the West Potomac Plan has a "direct and immediate" effect on the "day-to-day" business of the parties. *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 152 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Defendants' adoption and implementation of the plan diminishes the recreational space available in the park, thereby preventing Plaintiffs' members and other individuals from enjoying the uses for which the park was established more than a century ago. *E.g.*, Longenecker Decl. ¶ 13; Stierli Decl. ¶ 40; Crutchfield Decl. ¶ 10; Edmondson Decl. ¶ 11; *see* Act of Mar. 3, 1897, ch. 375, 29 Stat. 624 (providing that the land would be "forever held and used as a park for the recreation and pleasure of the people"). By adopting the plan without conducting legally required review processes, Defendants also deprived the organizational plaintiffs of the opportunity to participate in—and attempt to influence—those processes. Stierli Decl. ¶¶ 22–29; Miller Decl. ¶¶ 20–27; Feldman Decl. ¶¶ 15–22; Breitkopf Decl. ¶¶ 15–20; Chesser Decl. ¶¶ 45–50; Birnbaum Decl. ¶¶ 21–27. And the recent construction work, which has displaced recreational activity, Stierli Decl. ¶ 47, further shows that the West Potomac Plan has direct and immediate effects on Plaintiffs and others. *See Ass'n of Am. Univs. v. Dep't of Energy*, 789 F. Supp. 3d 118, 139 (D. Mass. 2025) (if policy "left any room for doubt as to whether Plaintiffs would experience any legal effect," agency's subsequent conduct "removed any such doubt").

Defendants insist that finality is lacking because they have yet to issue a permit or approve the expenditure of federal funds for the garden complex. Dkt. No. 13-1 at 23. To be sure, Defendants must take additional steps before installing the last statue. But that does not render the plan itself—that is, the decision to transform the park—nonfinal. *See Sackett v. EPA*, 566 U.S. 120, 127 (2012) ("The mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal."); *cf. N.Y. Stock Exch., Inc. v. Bloom*,

562 F.2d 736, 740 (D.C. Cir. 1977) (agency action "may be reviewable even though it is merely an announcement of a rule or policy that the agency has not yet put into effect").

Nor can Defendants downplay Secretary Burgum's statements about the garden complex as having "merely announced goals." Dkt. No. 13-1 at 23. For one, that characterization would be news to the President, who has declared that "we *are transforming* [West Potomac Park]" and that "[i]n West Potomac Park, we *are creating* the National Garden of American Heroes." Donald J. Trump (@realDonaldTrump), Truth Social, *supra* (emphasis added); *President Trump Delivers Remarks*, YouTube, *supra* (emphasis added). For another, it contradicts Secretary Burgum's own description of the garden complex project, which he has said "*will* be enjoyed for generations to come." Secretary Doug Burgum (@SecretaryBurgum), X, *supra* (emphasis added). And no doubt it would come as a surprise to potential donors who have received fundraising materials that ask for a "binding commitment of payment" to help fund the garden complex. Garden Fundraising Agreement at 10. At bottom, nothing about Secretary Burgum's statements—or the ample other evidence in the record supporting the existence of the West Potomac Plan—suggests that construction of the garden complex is a mere "goal."

Defendants' ripeness arguments fail on similar grounds. They recycle the assertion that Plaintiffs' injuries are not sufficiently imminent, Dkt. No. 13-1 at 19, which is incorrect for the reasons already explained. As to prudential ripeness, Defendants maintain that Plaintiffs' claims turn on the construction and particular design of the garden complex. *Id.* at 20. But in fact, the claims here present purely legal questions as to whether Defendants may construct a memorial garden complex in West Potomac Park without congressional authorization and without regard for other statutory requirements. Those questions do not require further factual development. *See Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1008 (D.C. Cir. 2014)

(concluding that it was "unnecessary to wait for" agency directive "to be applied in order to determine its legality"); *Pueblo of Santa Ana v. Hodel*, 663 F. Supp. 1300, 1308 (D.D.C. 1987) ("Having made the decision to publicly and definitively state his position, the Secretary cannot now avoid judicial review by claiming that he has not made a final decision . . . .").

Defendants insist that Plaintiffs can challenge "any final agency action . . . if and when Defendants authorize a final project to proceed." Dkt. No. 13-1 at 20. As discussed, the West Potomac Plan is final agency action, so Plaintiffs may challenge it now. And the government presumably would have said the same to avoid review of any challenge to the demolition of the East Wing while it was still standing. *Cf. Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.* (*Nat'l Tr. for Historic Pres. I*), 821 F. Supp. 3d 62, 66 (D.D.C. 2026) (noting that ground was broken "without advance notice" and that entire East Wing was demolished in days). The Court should not endorse the APA workaround Defendants have concocted, which relies on a "move fast and break things" approach. *See* Oral Argument at 18:30, *Nat'l Tr. for Historic Pres. III*, No. 26-5123 (D.C. Cir. June 5, 2026) (statement of Millett, J.).

Because "there are no institutional interests favoring postponement of review," *AT&T Corp. v. FCC*, 349 F.3d 692, 700 (D.C. Cir. 2003), "[t]he hardship prong under the ripeness doctrine is largely irrelevant," *Elec. Power Supply Ass'n v. FERC*, 391 F.3d 1255, 1263 (D.C. Cir. 2004). But in any event, Plaintiffs would suffer hardship from deferred judicial review. *Contra* Dkt. No. 13-1 at 20–21. As detailed in the complaint and declarations, the West Potomac Plan harms Plaintiffs' recreational and aesthetic interests in West Potomac Park, and it causes procedural and informational injuries to the organizational plaintiffs. In fact, the ongoing construction at West Potomac Park has already reduced the recreational space available for Plaintiffs and others. Stierli Decl. ¶ 47. Plaintiffs would suffer hardship if forced to endure these

ongoing harms while Defendants continue implementing their unlawful plan. *See U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1014 (D.C. Cir. 2002) (finding that plaintiff would suffer hardship from withholding judicial review where its members visited the affected park "and wish to experience its natural serenity"). That hardship would only grow if construction were permitted to continue during the pendency of this litigation. And deferring judicial review until the project is even further along would allow Defendants to argue, as they have in other cases, that it is too late for the Court to do anything. *See supra* at 20–21; *see also Village of Bensenville v. FAA*, 376 F.3d 1114, 1120 (D.C. Cir. 2004) (observing that postponing review "could burden the parties by preventing the municipalities from bringing their challenge at all"). In short, there is no basis to withhold review of Defendants' actions.

**2. The West Potomac Plan violates the Commemorative Works Act.**

On the merits, the West Potomac Plan straightforwardly violates the CWA, and Defendants have not argued otherwise. The CWA applies to commemorative works "in areas administered by the National Park Service and the Administrator of General Services in the District of Columbia and its environs." 40 U.S.C. § 8901(4). The act prohibits locating such commemorative works within the Reserve. *Id.* § 8908(c).

West Potomac Park is located within the Reserve and is administered by the Park Service. *See Commemorative Areas Washington, DC and Environs (Map Number 869/86501 B)*, *supra*; *History & Culture*, Nat'l Park Serv., https://perma.cc/CK5U-T467 (last visited Sep. 3, 2026). Defendants' garden complex is a commemorative work within the meaning of the CWA because it is "designed to perpetuate in a permanent manner the memory" of certain individuals. 40 U.S.C. § 8902(a)(1). Accordingly, the CWA's requirements apply, and congressional authorization is required to construct the garden complex in West Potomac Park.

Congress has not provided any such authorization. Nor has Congress carved out an exemption for the garden complex, as it has for other commemorative works. *See, e.g.*, Pub. L. No. 108-126, § 101, 117 Stat. at 1348 (authorizing construction of Vietnam Veterans Memorial Visitor Center and stating that provision of 40 U.S.C. § 8908 "prohibiting the siting of a visitor center within the Reserve shall not apply"); Pub. L. No. 111-88, § 128, 123 Stat. 2904, 2933 (2009) (authorizing addition of plaque to World War II Memorial to commemorate Senator Dole's leadership, "[n]otwithstanding any other law"); Pub. L. No. 117-81, § 6605, 135 Stat. 1541, 2442 (2021) ("Notwithstanding [40 U.S.C. § 8908(c)], the National Global War on Terrorism Memorial . . . shall be located within the Reserve."); *see also* Jacob R. Straus, Cong. Rsch. Serv., IF11937, *Commemorative Works Act: Siting Memorials in the District of Columbia* 2 (2024), https://perma.cc/X6F7-HATM (collecting examples of exemptions authorized by Congress). The lack of congressional authorization is fatal to the West Potomac Plan.

On top of that, Defendants have not complied with additional procedural requirements set forth in the CWA. For instance, the act requires that site and design proposals for commemorative works be submitted to the Commission of Fine Arts and the National Capital Planning Commission for approval. 40 U.S.C. § 8905(a)(2). But there is no indication Defendants have submitted any such proposals to those bodies. Meanwhile, other provisions of the CWA require that Congress designate a sponsor to establish a commemorative work, *id.* § 8902(a)(4), that the sponsor consult with the National Capital Memorial Advisory Commission regarding "alternative sites and design concepts," *id.* § 8905(a)(1), and that a commemorative work for an event, an individual, or a group of individuals "may not be authorized until after the 25th anniversary of the event, death of the individual, or death of the last surviving member of the group," *id.* § 8903(c). Defendants have violated these requirements as well.

### 3. The West Potomac Plan violates 40 U.S.C. § 8106.

The West Potomac Plan also runs afoul of 40 U.S.C. § 8106. That statute provides: "A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." 40 U.S.C. § 8106. This definition encompasses West Potomac Park, which is located in the District and maintained by the Park Service. *See History & Culture*, *supra*.

Again, the statutory violation is straightforward: as the renderings reveal, and public reporting indicates, the garden complex will include buildings and structures such as the statues themselves, dining facilities, and an amphitheater. Garden Fundraising Agreement at 3–8; *see* Broadwater & Small, *Trump's Vision for 'Garden of Heroes,' supra*. More recently, Defendants have begun the process of installing gazebos in the southeastern corner of the park, while also pouring concrete for bases and for walkways crossing the park's open fields. Stierli Decl. ¶¶ 42–45. Congress has not provided "express authority" for any of these buildings or structures. *See Nat'l Tr. for Historic Pres. III*, 2026 WL 2276494, at *23 (D.C. Cir. Aug. 7, 2026) ("The plain text of Section 8106 unambiguously bars the ballroom construction, absent another statute providing the National Park Service with 'express authority' to construct buildings in federal parks in the District of Columbia.").[8] The West Potomac Plan therefore violates § 8106.[9]

[8] Although the Supreme Court stayed the district court's preliminary injunction in the ballroom litigation, the majority of the Justices did not address the merits. *See Nat'l Tr. for Historic Pres. IV*, 2026 WL 2564318, at *4 ("Today, we do not pass upon the legality of the government's East Wing project."). Chief Justice Roberts, joined by three other Justices, did reach the merits and concluded that the ballroom construction was likely unlawful under § 8106 because "[t]he ballroom is a building or structure being erected on federal park grounds—President's Park—in the District of Columbia" and "Congress has not passed any law resembling 'express authority' for the Executive's construction of it." *Id.* (Roberts, C.J., dissenting).

[9] Plaintiffs also allege that Defendants' adoption and implementation of the West Potomac Plan violates the NHPA, NEPA, the Organic Act of 1916, and the Act of March 3, 1897, and that it is arbitrary and capricious and ultra vires. Compl. ¶¶ 153–84. Plaintiffs do not seek preliminary relief as to those claims at this time.

**C. The West Potomac Plan irreparably harms Plaintiffs.**

Plaintiffs are irreparably injured by Defendants' ongoing—and accelerating—implementation of the West Potomac Plan. As detailed above, Mr. Longenecker and members of NPCA and the Committee of 100 face substantial recreational and aesthetic harms from the West Potomac Plan. *E.g.*, Longenecker Decl. ¶ 13; Stierli Decl. ¶ 40; Crutchfield Decl. ¶ 10; Edmondson Decl. ¶ 11.

Those injuries are irreparable. Like environmental injuries, they "can seldom be adequately remedied by money damages and [are] often permanent or at least of long duration, *i.e.*, irreparable." *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). The D.C. Circuit therefore has found irreparable harm based on individuals' interests in "conserving natural resources for their aesthetic, recreational, and environmental use and enjoyment." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 324 (D.C. Cir. 1987). This Court has likewise concluded that plaintiffs established irreparable harm to "their ability to view, interact with, study, and appreciate mute swans." *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 220 (D.D.C. 2003). Several other courts have reached similar conclusions. *See, e.g.*, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018) (finding irreparable injury stemming from harm to certain species whose health plaintiffs depended on for "recreational and aesthetic pursuits"); *Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1086 (10th Cir. 2004) (plaintiffs showed irreparable injury where "enjoyment of their land" would "undoubtedly suffer somewhat as a result of the greater proximity of a major highway"); *see also Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 25 (D.D.C. 2009) ("Plaintiffs have met their burden to establish a likelihood of irreparable harm by showing that the Final Rule will have *some* environmental impacts, even if the extent of those impacts are not fully known.").

Recent developments have magnified these injuries. *See Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 100 (D.D.C. 2025) (finding irreparable harm where effects of Defendants' actions were "more acutely felt" with passage of time). Construction crews have begun to pour concrete and dig trenches within a large, fenced-off area of West Potomac Park. Stierli Decl. ¶¶ 43–45. This accelerating construction is already "displacing recreational use" because a portion of the park "is not available for recreational purposes." *Id.* ¶ 47. And more extensive work appears to be just around the corner, as Defendants have awarded a contract concerning the western portion of the Tidal Basin area. *See C--NAMA 245076 - Tidal Basin Redevelopment Plan*, *supra*; *see also* Tidal Basin Scope of Work at 2.

Plaintiffs' harms "cannot be remedied easily if at all." *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014). If the Court permits implementation of the West Potomac Plan to continue—including the ongoing construction activity—it will further diminish the recreational and historic value of the park. *See Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.* (*Nat'l Tr. for Historic Pres. II*), 827 F. Supp. 3d 93, 115 (D.D.C. 2026) (finding irreparable harm where "continued construction will only further lock in the size, scale, and styling of the proposed building"); *cf. San Diegans for Mt. Soledad Nat'l War Mem'l v. Paulson*, 548 U.S. 1301, 1303 (2006) (Kennedy, J., in chambers) (granting stay pending appeal where equities supported "preserving the status quo" in light of "the irreparable harm of altering [a] memorial"). The more unlawful construction Defendants are able to complete, the worse a state the park will be left in should Defendants later be required to undo that work, as the remains of crushed concrete and backfilled trenches would render ever larger swaths of the park unusable. All the while, Plaintiffs lose out on the opportunity to enjoy the park for the recreational purposes it has long served.

In addition, the organizational plaintiffs are irreparably harmed by Defendants' failure to comply with legally required processes before adopting and implementing the West Potomac Plan. The initiation of those processes would allow Plaintiffs "to present [their] concerns and expert knowledge about the impact of the West Potomac Plan before" Defendants make "irreversible changes" and the park "cannot be restored." *E.g.*, Stierli Decl. ¶¶ 29–30; *see supra* at 22–23. Because such procedural harms cannot be remedied at a later stage, courts routinely find that they are irreparable. *See, e.g.*, *Brady Campaign*, 612 F. Supp. 2d at 24 ("When a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury."); *Fund for Animals*, 281 F. Supp. 2d at 222 (procedural harm "bolster[ed] plaintiffs' case for a preliminary injunction" "when combined with the irreparable aesthetic injuries alleged by plaintiffs"); *see also Sierra Club*, 872 F.2d at 500–01 (explaining that "bureaucratic decisionmakers (when the law permits) are less likely to tear down a nearly completed project than a barely started project" and that district courts "should take account of the potentially irreparable nature of this decisionmaking risk to the environment when considering a request for preliminary injunction").

**D. The balance of the equities and public interest favor preliminary relief.**

The remaining factors overwhelmingly favor Plaintiffs. Defendants suffer no meaningful harm from a preliminary injunction or § 705 stay that preserves the status quo pending this Court's consideration of the merits. Any mild inconvenience that arises from pausing Defendants' (unlawful) implementation of the West Potomac Plan is far outweighed by the irreparable injury that would be inflicted on Plaintiffs and a historic public resource if the transformation of the park is allowed to proceed.

Further, Plaintiffs' "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest," as "[t]here is generally

no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (internal quotation marks and citation omitted). And there is an enormous public interest in the preservation of West Potomac Park, which is "a recreational haven for D.C. residents and a historically significant site." Stierli Decl. ¶ 29; *see also, e.g.*, *Nat'l Tr. for Historic Pres. III*, 2026 WL 2276494, at *42 ("National parklands in the District are 'unique resources that the Federal Government holds in trust for the American people.'" (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 290 (1984))).

Equity also favors preliminary relief to maintain the status quo and ensure that the Court can grant meaningful relief should Plaintiffs prevail. Ongoing construction work has already displaced recreational use of West Potomac Park—and will continue to do so—as construction vehicles and equipment occupy open spaces that park visitors previously used for recreation and gatherings. Stierli Decl. ¶ 47. And the further Defendants proceed with implementation of the West Potomac Plan, the more irreversible the plan's consequences are likely to become. *See Nat'l Tr. for Historic Pres. II*, 827 F. Supp. 3d at 115 n.19 (reasoning that if the court were to "allow construction to continue while the case progresses, any eventual victory on the merits for the [plaintiff] may . . . prove to be too little, too late"). Defendants' actions threaten to turn the construction of the garden complex into a *fait accompli*, preventing the Court's full consideration of the merits and denying Plaintiffs any recourse to remedy their harms. A preliminary injunction or § 705 stay is necessary to prevent that outcome.

**II. Plaintiffs have plausibly alleged their claims.**

Defendants' motion to dismiss fails for largely the same reasons discussed above. *Cf. Clarke v. Off. of Fed. Hous. Enter. Oversight*, 355 F. Supp. 2d 56, 66 (D.D.C. 2004) (granting

preliminary injunction and denying motion to dismiss that rested on same arguments). In evaluating a motion to dismiss under Rule 12(b)(1), "the Court must accept as true all of the factual allegations contained in the complaint and should review the complaint liberally while accepting all inferences favorable to the plaintiff." *Ctr. for Biological Diversity v. Jackson*, 815 F. Supp. 2d 85, 89 (D.D.C. 2011) (internal quotation marks and citations omitted). The same is true for a motion to dismiss under Rule 12(b)(6). *See, e.g.*, *Tefera v. OneWest Bank, FSB*, 19 F. Supp. 3d 215, 220 (D.D.C. 2014) ("The court must view the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." (citation omitted)).

As to Defendants' standing arguments, Plaintiffs need only "'state a *plausible* claim' that each of the standing elements is present." *Attias*, 865 F.3d at 625 (citation omitted); *see also Lujan*, 504 U.S. at 561 (explaining that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice"). Plaintiffs have shown recreational and aesthetic harms to Mr. Longenecker and NPCA and Committee of 100 members, along with procedural and informational injuries to the organizational plaintiffs. *E.g.*, Compl. ¶¶ 110–23; *see supra* at 14–18, 22–24. And those injuries are sufficiently imminent: Plaintiffs allege, for example, that the garden complex "will transform West Potomac Park and dramatically impair—if not eliminate altogether—its recreational qualities, including by removing the softball fields, diminishing other open grassy areas currently free for formal and informal recreational sports, and curtailing the space available to bicyclists." Compl. ¶ 96; *see supra* at 18–22. The injuries described in the complaint and declarations adequately allege standing.[10]

[10] Plaintiffs' declarations may be considered in evaluating Defendants' motion to dismiss. *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 585 F. Supp. 3d 63, 70 (D.D.C.

Defendants' final agency action and ripeness arguments are equally meritless. Plaintiffs allege that "Defendants have made a final decision to undertake the plan and to locate the project in West Potomac Park; one of the President's top fundraisers is actively seeking contributions to support its construction; and the President and Secretary of the Interior have publicly shared renderings of the project." Compl. ¶ 122; *see supra* at 24–30. Viewed in the light most favorable to Plaintiffs, the complaint plausibly alleges that the West Potomac Plan is final agency action and that deferring judicial review is unwarranted.

Defendants argue that the claims against the Park Service and Comptroller Bowron should be dismissed because the complaint "includes zero allegations regarding [their] involvement in the alleged plan for the Garden." Dkt. No. 13-1 at 11. But the complaint alleges that the Park Service and Comptroller Bowron are responsible for managing, controlling, and regulating the National Park System, including West Potomac Park, and that Defendants have adopted and begun implementing a plan to transform the park into a garden complex. Compl. ¶¶ 27–28. Even if the Park Service and Comptroller Bowron have not joined the President and Secretary Burgum in publicly announcing that decision, it strains credulity to suggest the agency has nothing to do with a plan to remake one of its own sites.

Finally, Defendants contend that ultra vires review is unavailable. Dkt. No. 13-1 at 24–25. Defendants have already taken final agency action, so the Court may review Plaintiffs' claims under the APA. In the alternative, however, Plaintiffs may seek ultra vires review because there would be "no other means . . . to protect and enforce [a statutory] right." *See Leedom v. Kyne*, 358 U.S. 184, 190 (1958). Defendants suggest Plaintiffs should wait for some

2022) (noting that "courts in this district routinely consider associated affidavits or exhibits when deciding a motion under Rule 12(b)(1)").

potentially forthcoming determination from the agencies. Dkt. No. 13-1 at 24. But implementation of the plan—including construction activity at the park—is ongoing, so it is hard to see how the future review Defendants promise could be "meaningful and adequate." *See Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citation omitted). And Plaintiffs do not take issue with "incipient discussions," *contra* Dkt. No. 13-1 at 24; they challenge a decision—announced publicly by the President and Secretary Burgum—to transform West Potomac Park.

Nor do Plaintiffs suggest that "an agency has arguably reached a conclusion which does not comport with the law." *Contra id.* at 25 (quoting *Nuclear Regul. Comm'n*, 605 U.S. at 681). Ultra vires review is available where "an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute." *Nuclear Regul. Comm'n*, 605 U.S. at 681 (citation omitted). That is true at least twice over in this case. The CWA forbids the location of any new commemorative work within the Reserve, 40 U.S.C. § 8908(c), while 40 U.S.C. § 8106 prohibits the erection of "[a] building or structure . . . on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." Defendants' disregard for those clear statutory commands is precisely "the kind of 'extreme' error" that would justify ultra vires review. *See Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009); *see also Nat'l Tr. for Historic Pres. III*, 2026 WL 2276494, at *26 (holding that § 8106 "is a 'clear and mandatory' provision that leaves no discretion and thus can support *ultra vires* review" (citation omitted)).

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion for preliminary injunction or 5 U.S.C. § 705 stay and deny Defendants' motion to dismiss.

Date: September 15, 2026

Respectfully submitted,

/s/ *Michael J. Torcello*
Michael J. Torcello (DC Bar No. 90014480)
Alethea Anne Swift (DC Bar No. 1644929)
Catherine M.A. Carroll (DC Bar No. 497890)
Robin F. Thurston (DC Bar No. 1531399)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
mtorcello@democracyforward.org
aswift@democracyforward.org
ccarroll@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs*