**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL PARKS CONSERVATION ASSOCIATION, *et al.*,

*Plaintiffs*,

v.

DOUG BURGUM, *et al.*,

*Defendants*.

Civil Action No. 1:26-cv-02103

**OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS


INTRODUCTION .......... 1

I. President Trump Issues and President Biden Revokes the Garden of American Heroes Executive Orders .......... 3

II. After His Reelection, President Trump Again Calls for the Creation of a Garden of American Heroes .......... 5

III. President Trump and Secretary Burgum Post About the Garden of American Heroes on Social Media .......... 5

IV. President Trump and Secretary Burgum Speak to the Press About the President's Vision for the Garden of American Heroes .......... 6

V. West Potomac Park Is a Large, Diverse Park in the Nation's Capital .......... 7

VI. West Potomac Park Is the Current or Proposed Site of Multiple, Distinct National Park Service Projects .......... 8

A. The Seawall Project .......... 9

B. The Tidal Basin Plan .......... 10

C. The National Garden of American Heroes .......... 11

D. The Uzbek Aywans .......... 11

VII. Plaintiffs Sue to Challenge the Preliminary Concept for the Garden of American Heroes .......... 13

VIII. Defendants Move to Dismiss .......... 14

IX. Plaintiffs Move for a Preliminary Injunction .......... 14

ARGUMENT .......... 15

I. The Court Should Deny Plaintiffs' Motion for a Preliminary Injunction or a 5 U.S.C. § 705 Stay .......... 15

A. Plaintiffs Fail to Show They Will be Irreparably Harmed Absent a Preliminary Injunction .......... 17

B. Plaintiffs Fail to Show a Likelihood of Success on the Merits of Their Claims .......... 22

C. The Public Interest and the Equities Favor Denying Injunctive Relief .......... 38

II. The Court Should Grant Defendants' Motion to Dismiss .................................... 42

CONCLUSION.......................................................................................................................... 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs v. Garner*,
387 U.S. 136 (1967) .......... 31, 32

*Am. Forest Res. Council v. United States*,
77 F.4th 787 (D.C. Cir. 2023) .......... 34, 36

*Am. Petroleum Inst. v. EPA*,
683 F.3d 382 (D.C. Cir. 2012) .......... 31

*Atl. States Legal Found. v. EPA*,
325 F.3d 281 (D.C. Cir. 2003) .......... 31

*Benisek v. Lamone*,
585 U.S. 155 (2018) .......... 21

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 36, 37

*Biomin Am., Inc. v. Lesaffre Yeast Corp.*,
No. 20-cv-02109, 2020 WL 1503475 (D. Kan. Mar. 30, 2020) .......... 19

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .......... 19, 21

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 23, 26, 27, 28, 29

*Clevinger v. Advoc. Holdings, Inc.*,
134 F.4th 1230 (D.C. Cir. 2025) .......... 16, 17, 22

*Coal. for Indep. Tech. Rsch. v. Rubio*,
836 F. Supp. 3d 215 (D.D.C. 2026) .......... 16

*Comm'n v. Texa*s,
("NRC"), 605 U.S. 665 (2025) .......... 43, 45

*Comm'n v. Texas,*
605 U.S. 665 (2025) .......... 43, 44, 45

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*,
585 F. Supp. 3d 63 (D.D.C. 2022) .......... 42

*Ctr. for Democracy & Tech. v. Trump*,
507 F. Supp. 3d 213 (D.D.C. 2020) .......... 29

*Cuomo v. U.S. Nuclear Regul. Comm'n*,
772 F.2d 972 (D.C. Cir. 1985) .......... 16

*Davis v. Fed. Election Comm'n*,
554 U.S. 724 (2008) ... 22

*Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*,
85 F. Supp. 3d 250 (D.D.C. 2015) ... 32

*Devia v. Nuclear Regul. Comm'n*,
492 F.3d 421 (D.C. Cir. 2007) ... 31, 33

*Doe v. Doe Agency*,
608 F. Supp. 2d 68 (D.D.C. 2009) ... 30

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ... 26

*Fund for Animals v. Williams*,
391 F. Supp. 2d 132 (D.D.C. 2005) ... 35

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
460 F.3d 13 (D.C. Cir. 2006) ... 34, 35, 36, 37

*Giron v. Zeytuna, Inc.*,
597 F. Supp. 3d 29 (D.D.C. 2022) ... 30

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ... 44

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) ... 17, 18, 20

*Harris Cnty. v. Kennedy*,
786 F. Supp. 3d 194 (D.D.C. 2025) ... 15

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) ... 22

*In re Idaho Conservation League*,
811 F.3d 502 (D.C. Cir. 2016) ... 28

*Indep. Equip. Dealers Ass'n v. EPA*,
372 F.3d 420 (D.C. Cir. 2004) ... 34, 35, 36, 37, 38

*Jibril v. Mayorkas*,
20 F.4th 804 (D.C. Cir. 2021) ... 28

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ... 41

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ... 34, 38

*Murthy v. Missouri*,
603 U.S. 43 (2024)........................................................................................23, 24

*Musk v. OpenAI, Inc.*,
769 F. Supp. 3d 1017 (N.D. Cal. 2025).........................................................................19

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
783 F. Supp. 3d 290 (D.D.C. 2025)...............................................................................39

*Nat'l Min. Ass'n v. McCarthy*,
758 F.3d 243 (2014)........................................................................................36, 37

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003)..............................................................................................30

*Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.,*
185 F.4th 1185 (D.C. Cir. 2026)...................................................................................45

*Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.*,
821 F. Supp. 3d 62 (D.D.C. 2026).................................................................................38

*Nat'l Treasury Emps. Union v. United States*,
101 F.3d 1423 (D.C. Cir. 1996).............................................................................32, 33

*Nken v. Holder*,
556 U.S. 418 (2009)..............................................................................................16

*Norton v. S. Utah Wilderness All.,*
542 U.S. 55 (2004)................................................................................................34

*Nyunt v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009)...............................................................................44, 45

*Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*,
656 F. Supp. 3d 137 (D.D.C. 2023)...............................................................................27

*POET Biorefining, LLC v. EPA*,
970 F.3d 392 (D.C. Cir. 2020).....................................................................................30

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016).....................................................................................39

*Sierra Club v. Fed. Energy Regul. Comm'n*,
153 F.4th 1295 (2025)............................................................................................25

*Sierra Club v. Jewell,*
764 F.3d 1 (D.C. Cir. 2014)......................................................................................28

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)..............................................................................................22

*Tex. Health & Hum. Servs. Comm'n v. United States*,
166 F. Supp. 3d 706 (N.D. Tex. 2016) ........ 19

*Texas v. United States*,
523 U.S. 296 (1998) ........ 30

*Toilet Goods Ass'n v. Gardner*,
387 U.S. 158 (1967) ........ 31

*Trump v. California*,
No. 26A124, 2026 WL 2473573 (U.S. Aug. 24, 2026) ........ 23, 39

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........ 39

*Trump v. New York*,
592 U.S. 125 (2020) ........ 27, 32

*Trump v. Orr*,
146 S. Ct. 44 (2025) ........ 40

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) ........ 37

*Union of Concerned Scientists v. U.S. Dep't of Energy*,
998 F.3d 926 (D.C. Cir. 2021) ........ 27

*United States v. Quadro Corp.*,
916 F. Supp. 613 (E.D. Tex. 1996) ........ 19

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........ 15, 16, 17, 21, 22, 39, 41

**Statutes**

40 U.S.C. § 8106, Section 106 ........ 14, 45

40 U.S.C. § 8906(a) ........ 24

5 U.S.C. § 551(13) ........ 34

5 U.S.C. § 702 ........ 33

5 U.S.C. § 704 ........ 36, 38

5 U.S.C. § 705 ........ 16

54 U.S.C. § 306108 ........ 25

DC Code § 10–147 ........ 26

Pub. L. No. 119-21, § 86001, 139 Stat. 72, 356 (2025) ........ 5

**Rules**

Fed. R. Civ. P. 12(b)(1) .......... 43

Fed. R. Civ. P. 12(h)(3) .......... 43

**Other Authorities**

Exec. Order No. 13,978, 86 Fed. Reg. 6809 (Jan. 18, 2021) .......... 4

Exec. Order No. 13934, 85 Fed. Reg. 41165 (July 3, 2020) .......... 3, 4

Exec. Order No. 14029, 86 Fed. Reg. 27025 (May 14, 2021) .......... 5

Exec. Order No. 14189, 90 Fed. Reg. 8849 (Jan. 29, 2025) .......... 5

## INTRODUCTION

In their lawsuit, Plaintiffs' challenge the legality of what they have dubbed the "West Potomac Plan." According to Plaintiffs, the "West Potomac Plan" is "Defendants' plan to transform West Potomac Park into the National Garden of American Heroes," a statue garden proposed by the President and intended to celebrate historically significant Americans. Dkt. No. 15-15. *See also* Compl. ¶ 4, Dkt. No. 1. But Plaintiffs' case fails at the outset because, as Superintendent of National Mall and Memorial Parks Dr. Kevin Griess testifies, there is no West Potomac Plan and the National Park Service has not been directed to include the National Garden of American Heroes in West Potomac Park. Ex. 1, (Griess Decl.) ¶¶ 51-57.

West Potomac Park is 409 acres, and myriad activities occur there that have nothing to do with the proposed National Garden of American Heroes. One such activity is the temporary exhibition of two gazebos, also known as aywans, gifted to the United States by Uzbekistan as a sign of the friendship between the two nations. The purposes of the temporary exhibition are to provide park visitors with the opportunity to appreciate the expert craftsmanship and artistic beauty of the aywans and to educate the visitors regarding the relationship between the United States and Uzbekistan. The Uzbek aywans are not a part of the proposed National Garden of American Heroes; in fact, it would make no sense to include Uzbek aywans in a statue garden intended to celebrate historically significant Americans.

Although the temporary exhibition of the Uzbek aywans has nothing to do with the National Garden of American Heroes and therefore nothing to do with this lawsuit, that activity forms the basis of Plaintiffs' motion for a preliminary injunction. Defense counsel has repeatedly explained to Plaintiffs' counsel, across multiple meet and confers, that the Uzbek aywans are

temporary exhibits that are irrelevant to their claims. Nevertheless, Plaintiffs filed their motion for a preliminary injunction along with their opposition to Defendants' motion to dismiss.

The Court should deny Plaintiffs' motion for a preliminary injunction and dismiss this case. First, Plaintiffs will not be irreparably harmed in the absence of relief. Plaintiffs' claims of irreparable harm depend on the construction of the National Garden of American Heroes, which Plaintiffs claim will affect their use and enjoyment of West Potomac Park. The temporary exhibition of the Uzbek aywans is the only activity in West Potomac Park that Plaintiffs point to as evidence that the construction of the National Garden of American Heroes is occurring or will imminently occur. But the Uzbek aywans are not a part of the National Garden of American Heroes. And Defendants are not currently building and will not imminently build the National Garden of American Heroes, which is still a preliminary concept. Accordingly, Plaintiffs will not be irreparably harmed absent preliminary relief, and the Court should deny Plaintiffs' preliminary injunction motion on that basis alone.

Second, Plaintiffs cannot show a likelihood of success on the merits. Plaintiffs lack standing because they cannot show an actual or imminent injury to any aesthetic or recreational interests related to West Potomac Park without actual or imminent construction. And Plaintiffs cannot allege informational or procedural harms from Defendants' failure to meet statutory obligations that do not apply to a preliminary concept and that Defendants will satisfy, if and when those statutory obligations become applicable. For similar reasons, Plaintiffs' claims are not ripe. Plaintiffs' Administrative Procedure Act (APA) claims fail on the merits because the APA excludes the preliminary concept for the National Garden of American Heroes from the definition of agency action subject to judicial review. Further, the preliminary concept for the National Garden of American Heroes is not sufficiently "final" to be subject to review under the APA.

Because Plaintiffs' claims are meritless, the Court should deny their motion for a preliminary injunction and grant Defendants' motion to dismiss.

Finally, granting a preliminary injunction would be contrary to the public interest and the equities favor denying emergency relief. Because Plaintiffs lack standing; this Court lacks subject matter jurisdiction, an injunction would exceed the Court's authority, and that injunction would irreparably harm the government. The ambiguity of Plaintiffs' requested injunction could also subject a variety of Defendants' actions in a 409-acre park to Plaintiffs' supervision. Because Plaintiffs' invented "West Potomac Plan" does not exist, it is unclear what actions their proposed injunction is would reach. Thus the requested injunction is likely to mire the court in disputes over routine park management activities. Worse yet, Plaintiffs' injunction would halt the temporary installation of the Uzbek aywans, depriving the public of the opportunity to experience the beauty of the aywans and interfering with the United States' foreign policy. The Court should deny Plaintiffs' motion for a preliminary injunction.

## BACKGROUND

### I. President Trump Issues and President Biden Revokes the Garden of American Heroes Executive Orders

On July 3, 2020, President Trump signed an Executive Order titled "Building and Rebuilding Monuments to American Heroes." Exec. Order No. 13934, 85 Fed. Reg. 41165 (July 3, 2020). In that Order, President Trump noted monuments' virtues as "silent teachers" that "express our noblest ideals: respect for our ancestors, love of freedom, and striving for a more perfect union." *Id.* § 1. And he decried the then-recent destruction, vandalization, and removal of monuments, including "monuments to Christopher Columbus, George Washington, Thomas Jefferson, Benjamin Franklin, Francis Scott Key, Ulysses S. Grant, leaders of the abolitionist

movement, the first all-volunteer African-American regiment of the Union Army in the Civil War, and American soldiers killed in the First and Second World Wars." *Id.* To combat the "assault on our collective national memory[,]" President Trump created a Task Force for Building and Rebuilding Monuments to American Heroes. *Id.* §§ 1-2. The Task Force's duty was to present options to the President for the construction of a National Garden of American Heroes, which would include statues of "historically significant Americans[.]" *Id.* §§ 3(c)(iii), 7. The President recognized that none of those commemorated in the Garden "will have lived perfect lives," but required that all "be worth honoring, remembering, and studying." *Id.* § 3(c)(iii). Under the Order, the Garden would be placed "on a site of natural beauty that enables visitors to enjoy nature, walk among the statues, and be inspired to learn about great figures of America's history." *Id.* § 3(c)(v).

In January 2021, President Trump signed a follow-on Executive Order titled "Building the National Garden of American Heroes." Exec. Order No. 13978, 86 Fed. Reg. 6809 (Jan. 18, 2021). That Order expanded the list of historically significant Americans who would be represented in the Garden. *Id.* § 3. The expanded list celebrates American diversity and the breadth of American achievements, honoring men and women of different races, from different eras, who contributed to the nation across a wide range of endeavors. *Id.* The Order directed the Secretary of the Interior to provide funding for the Garden, identify a suitable site for the Garden, and to proceed with construction of the Garden. *Id.* §§ 4-5. The Order directed the chairs of the National Endowment for the Arts and the National Endowment for the Humanities to provide funding for the "commissioning [of] statues." *Id.* § 5(b). And the Order directed the Task Force to provide an annual public report detailing progress made toward establishing the Garden. *Id.* § 6.

On May 14, 2021, President Biden rescinded both Executive Orders related to the Garden. *See* Exec. Order No. 14029, 86 Fed. Reg. 27025 (May 14, 2021).

### II. After His Reelection, President Trump Again Calls for the Creation of a Garden of American Heroes

Nine days after being inaugurated President for the second time, President Trump issued an executive order titled "Celebrating America's 250th Birthday." Exec. Order No. 14189, 90 Fed. Reg. 8849 (Jan. 29, 2025). The Order's purpose was "to provide a grand celebration worthy of the momentous occasion of the 250th anniversary of American Independence" and "to take other actions to honor the history of our great Nation." *Id.* § 1. Among other things, the Order reinstated both of President Trump's prior Executive Orders related to the Garden and called on the Assistant to the President for Domestic Policy to propose "additional historically significant Americans for inclusion" in the Garden, "bring[ing] the total number of heroes to 250." *Id.* § 3(b).

Following the Presidents' Executive Order, the National Endowment for the Humanities "announced a grant program to support the garden, requesting 'preliminary concepts' for statues and offering awards of up to $200,000 per statue." Compl. ¶ 81. Congress subsequently "appropriated $40 million to the NEH, to remain available through fiscal year 2028, 'for the procurement of statues'" for the Garden. *Id.* ¶ 84 (quoting Pub. L. No. 119-21, § 86001, 139 Stat. 72, 356 (2025)). Plaintiffs allege a private fundraiser—the National Garden of American Heroes Foundation—has also solicited donations to fund the National Garden of American Heroes. *Id.* ¶¶ 93-98. The fundraiser's solicitations include artistic renderings of a potential garden. *Id.* ¶ 96.

### III. President Trump and Secretary Burgum Post About the Garden of American Heroes on Social Media

On May 15, 2026, President Trump posted on Truth Social that the National Garden of American Heroes would be "located in West Potomac Park[.]" Compl. ¶ 100 (citation omitted). The President included a similar artistic rendering as the National Garden of American Heroes Foundation's fundraising solicitation. Compl. ¶¶ 100-01. *See also id.* ¶ 96. Later that day,

Secretary Burgum posted the same photo on X with the caption: "As America approaches its 250th birthday, @POTUS is continuing to honor our nation's legacy with the National Garden of American Heroes, a landmark in Washington, D.C. that will be enjoyed for generations to come." Compl. ¶ 102 (citation omitted).

### IV. President Trump and Secretary Burgum Speak to the Press About the President's Vision for the Garden of American Heroes

On June 4, President Trump met with the press to announce a $700 million investment in the clean coal industry intended to increase the supply of affordable energy. *President Trump Announces $700 Million for Coal Industry*, C-SPAN (June 4, 2026), https://www.c-span.org/program/white-house-event/president-trump-makesannouncement-on-clean-coal/680441 (cited at Compl. ¶¶ 106-09). As an aside, President Trump asked Secretary Burgum "how are you doing" on various "projects that we're just starting," including the Garden. *Id.* at 22:00-24:10. Secretary Burgum responded by describing "the vision [the President] has for these projects." *Id.* at 24:10-26:07. Secretary Burgum did not provide a timeline for any of the projects and did not describe any of the projects beyond their general features. *Id.*

## V. West Potomac Park Is a Large, Diverse Park in the Nation's Capital

West Potomac Park is a 409-acre park in southwest Washington, D.C. Griess Decl. ¶ 4. The image below accurately depicts West Potomac Park. *Id.* ¶ 5.




West Potomac Park "contains nationally recognized memorials and commemorative landscapes[.]" *Id.* ¶ 5. The portion of the park along the eastern edge of the Tidal Basin includes the recently added Martin Luther King, Jr. Memorial and the Franklin Delano Roosevelt Memorial. *Id.* ¶ 9. After walking about ten minutes northwest from the MLK Memorial, a visitor to West Potomac Park will come upon the Lincoln Memorial and the Lincoln Memorial Reflecting Pool. *Id.* If he kept walking north in West Potomac Park, past the Lincoln Memorial, a visitor would find the Vietnam Veterans Memorial and the Desert Shield & Desert Storm Memorial, which is under construction. *Id.* If instead of walking northwest from the MLK Memorial, a visitor strolled south along the Tidal Basin, in twenty minutes he would find himself at the Thomas Jefferson

Memorial, having walked by the George Mason Memorial. *Id.* Across West Potomac Park's 409 acres, visitors encounter a variety of other large memorials and small commemorative features, new and old, well-known and relatively obscure. *Id.*

Along with these monuments, West Potomac Park includes recreation spaces. *Id.* ¶ 10. The park includes the JFK Hockey Fields, the Polo Field, softball fields, volleyball courts, a Water Taxi stop, five concessions stands, and the Tidal Basin. *Id.* ¶¶ 10, 15. West Potomac Park is also the site of the annual Cherry Blossom Festival. *Id.* ¶ 10.

The National Park Service "maintains the lands, facilities, landscapes, and other resources under its jurisdiction within West Potomac Park." *Id.* ¶ 12. "Routine maintenance includes mowing and other turf care; aeration, seeding, fertilization, and soil management; tree and shrub pruning and care; leaf and debris removal; litter collection; maintenance of planting beds; and repair and upkeep of walks, roads, curbs, signs, site furnishings, drainage features, and other park infrastructure." *Id.* "Maintenance activities also include inspection and care of memorial landscapes and other cultural landscape features, as well as routine measures necessary to maintain safe and usable public spaces." *Id.* To facilitate its stewardship of West Potomac Park, the National Park Service houses maintenance equipment and materials in West Potomac Park. *Id.* ¶ 11. Additionally, West Potomac Park contains law enforcement facilities such as the United States Park Police Horse Stables and Educational Center. *Id.* ¶ 10.

## VI. West Potomac Park Is the Current or Proposed Site of Multiple, Distinct National Park Service Projects.

Consistent with its size and the diversity of its resources, West Potomac Park is the current or proposed site for multiple, distinct projects. A few are described here.

### A. The Seawall Project

In 2023, the National Park Service began a project to rehabilitate the Tidal Basin and West Potomac Park Seawalls. Griess Decl. ¶ 13. "Given the site constraints surrounding the Tidal Basin, the [National Park Service] determined that two existing softball fields and a portion of the larger open recreational area at West Potomac Park would need to be used as a staging area during construction of the Seawall Project." *Id.* ¶ 15. "Construction staging and laydown areas proximate to the work areas are necessary for safe and efficient construction." *Id.* "For public safety reasons, the [National Park Service]'s contractor for the Seawall Project erected an 8-foot-tall wooden fence around the construction staging area in West Potomac Park" in 2023. *Id.* ¶ 16. "The rehabilitation of the Tidal Basin Seawall was completed in December 2025 and work on the West Potomac Park Seawall was completed in April 2026." *Id.* ¶ 18. "The contractor then turned to work rehabilitating the staging area." *Id.* Below is an aerial depiction of the construction staging area for the Seawall Project on July 25, 2026. *Id.*




The National Park Service's "contractor is required to restore the area[,]" "[u]pon completion of the Seawall Project[.]" *Id.* ¶ 19. "The contractor has already begun this work and

is expected to continue restoration work through the month of October." *Id.* "The fence will remain in place, for public safety, until the restoration work is complete." *Id.*

**B. The Tidal Basin Plan**

The National Park Service "has been pursuing a Tidal Basin Development Concept Plan for the Tidal Basin and surrounding areas" since early 2025. Griess Decl. ¶ 39. The Tidal Basin Plan is intended "to provide direction for the long-term management and rehabilitation of the Tidal Basin and surrounding areas and to address" particular "management challenges in the area[.]" *Id.* "[T]he planning process" for the Tidal Basin Plan "is ongoing." *Id.* ¶ 41. "On July 20, 2026, the [National Park Service] sent a Request for Architect and Engineering Task Order Qualifications ("RFQ"), seeking statements of qualifications from a nationwide pool of qualified vendors for a variety of tasks including revising and updating the Tidal Basin Plan and environmental assessment, delivering architect/engineering and environmental planning services, analyzing alternatives and impacts, facilitating stakeholder engagement and public review, coordinating Commission on Fine Art ("CFA") and [National Capital Planning Commission] review of the plan, and coordinating compliance with Section 106 of the [National Historic Preservation Act] and the [Endangered Species Act]." *Id.* ¶ 41. *See also* Pls.' Mem. Ex. B and Ex. C, Dkt. Nos. 15-13, 15-14. "On August 24, 2026, the [National Park Service] awarded a contract for architect and engineering services to update the preferred alternative in the environmental assessment for the Tidal Basin Plan, and complete required compliance for the Plan." Griess Decl. ¶ 42. "The contract for architect and engineering services . . . does not include construction services." *Id.* ¶ 49. "Once all required compliance for the Tidal Basin Plan is complete, . . . the [National Park Service] would need to enter into a contract for construction services to implement the Plan on the ground." *Id.*

**C. The National Garden of American Heroes**

Although the President and Secretary Burgum have identified West Potomac Park as their current preferred location for the National Garden of American Heroes, the National Park Service has not made "a final decision … to site the National Garden in West Potomac Park." Griess Decl. ¶ 51. There has been no "direction to include the National Garden in West Potomac Park and the current conceptual designs for the Tidal Basin Plan do not include statues." *Id.* ¶ 52. Accordingly, the National Park Service "has not yet initiated a planning process that includes such a project" and "has not begun the compliance processes that would be required to implement" the National Garden of American Heroes. *Id.* ¶¶ 52-53. The National Park Service also has "not awarded a construction contract" or "issued a permit for construction" related to the National Garden of American Heroes." *Id.* ¶ 53. "There is no current or imminent construction activity for the National Garden of American Heroes in West Potomac Park." *Id.* If the National Park Service "were to initiate a project to include the National Garden in West Potomac Park," the National Park Service "would comply with all applicable laws and regulations prior to implementing such project." *Id.* ¶ 54.

**D. The Uzbek Aywans**

The President of Uzbekistan presented two gazebos, also known as aywans, as a gift to the President of the United States. Griess Decl. ¶ 20. The National Park Service "is moving forward with a project to temporarily exhibit the two aywans in West Potomac Park." *Id.* ¶ 21. *See also* Griess Exs. A-E. "Once assembled each aywan will measure approximately 31 feet wide and 26 feet high." *Id.* ¶ 26. "Temporary concrete foundations and access pathways have been installed to accommodate the aywans and to provide wheelchair accessible access to visitors." *Id.* "The walkways and foundations supporting the aywans will be surrounded by turf." *Id.* The aywans are

"fully removable" and the National Park Services expects the exhibit to last for "less than six months." *Id.* ¶¶ 22, 27. *See also* Griess Decl. Ex. A at 2. "The purpose of the Project is . . . to educate the visitors regarding the relationship between the United States and Uzbekistan" and to provide them with the opportunity to appreciate the "artistic beauty of the aywans[.]" *Id.* ¶ 21.

"The work pouring the temporary concrete pads, tiling the pads, and assembling the aywans has been completed by 14 Uzbeki master craftsmen, who completed the work as Volunteers in Parks." *Id.* ¶ 29. The National Park Service oversaw their work. *Id.* The National Park Service's "work on site include[d] turf restoration" and "constructing the temporary walkways to provide visitor access to the aywans during the Temporary Exhibition[.]" *Id.*

"One aywan will be displayed in the staging area for the Seawall Project, which has been closed since late 2023." *Id.* ¶ 22. "The other aywan will be displayed in an area immediately adjacent to the staging area." *Id.* Below is a depiction of the planned sites for the aywans as well as the staging area for the Seawall Project. *Id.* ¶ 23.



"During the Temporary Exhibition, the two ballfields in West Potomac Park that have been unavailable since Fall 2023 (as a result of the Seawall Project) will continue to be unavailable" but "the surrounding areas will be open to the public to view the gazebos and for other recreational purposes." *Id.* ¶ 28. "After the Temporary Exhibition has concluded and the aywans have been removed, the affected areas will be restored, as necessary, to their original condition." *Id.*

"The Temporary Exhibition [of the Uzbek aywans] is separate from and unrelated to any future proposals to site the National Garden in or around West Potomac Park and is not intended to be included in the National Garden[.]" *Id.* ¶ 56.

## VII. Plaintiffs Sue to Challenge the Preliminary Concept for the Garden of American Heroes

On June 15, 2026, Plaintiffs sued Secretary Burgum, the Department of the Interior, Jessica Bowron, and the National Park Service, Plaintiffs alleging Secretary Burgum's post and comments to the press are evidence of a "West Potomac Plan"—a term Plaintiffs invented—and that the "Plan" is a final agency action subject to review under the APA. Compl. ¶¶ 4, 100-03, 132. Plaintiffs define the "West Potomac Plan" as "Defendants' plan to transform West Potomac Park into the National Garden of American Heroes or any similar garden complex[.]" Dkt. No. 15-15. Plaintiffs allege Defendants have harmed their informational and procedural interests by not following procedures required by the Commemorative Works Act ("CWA"), Section 106 of the National Historic Preservation Act ("NHPA), and the National Environmental Policy Act ("NEPA") before adopting the alleged "Plan." Compl. ¶¶ 8, 111. And Plaintiffs allege construction of the Garden in West Potomac Park under the so-called "West Potomac Plan" would harm their "historic, aesthetic, recreational, and other interests." *Id.* ¶ 8. Plaintiffs press six claims for relief under the APA. *Id.* ¶¶ 131-79. Plaintiffs allege the "West Potomac Plan" is arbitrary

and capricious and contrary to the CWA, 40 U.S.C. § 8106, Section 106 of the NHPA, NEPA, the National Park Service's Organic Act. *Id.* Plaintiffs also press an *ultra vires* claim. *Id.* ¶¶ 180-84.

## VIII. Defendants Move to Dismiss

On August 17, Defendants moved to dismiss. Dkt. No. 13. In that motion, Defendants explained that the National Garden of American Heroes "is still a preliminary concept[.]" Mem. in Supp. of Defs.' Mot. to Dismiss, Dkt. No. 13-1 at 1. Plaintiffs lack standing because they cannot show an actual or imminent injury from a preliminary concept that has not been implemented. *Id.* at 13-18. And Plaintiffs cannot allege informational and procedural harms from Defendants' failure to meet statutory obligations that are not yet applicable and that Defendants will satisfy, if and when those statutory obligations become applicable. *Id.* For similar reasons, Plaintiffs' claims are not ripe. *Id.* at 18-21. The APA also excludes the preliminary concepts for the Garden from the definition of agency action subject to judicial review. *Id.* at 21-22. Further, the preliminary concepts for the Garden are not sufficiently "final" to be subject to review under the APA. *Id.* at 23-24. Finally, Plaintiffs *ultra vires* claim fails because APA review will be available if any plan for the Garden is finalized and construction is authorized. *Id.* at 24-25.

## IX. Plaintiffs Move for a Preliminary Injunction

On Thursday, September 3, Plaintiffs contacted Defendants requesting a meet and confer regarding "construction of gazebos that the Uzbekistan ambassador has said were gifted for the Garden of Heroes." Ex. 2. Plaintiffs' counsel stated that Plaintiffs were "prepared to seek emergency relief from the Court to halt the ongoing construction activity[.]" *Id.* When the parties met and conferred by phone, Plaintiffs confirmed that all the construction activity underlying their contemplated motion for emergency relief related to the Uzbek aywans. Defendants explained that the Uzbek aywans have nothing to do with the National Garden of American Heroes and that

the Uzbek aywans are a temporary exhibit that will be in West Potomac Park for approximately six months. Plaintiffs elected not to file a motion for emergency relief. Ex. 3.

Ten days later, and the day before the deadline for Plaintiffs' opposition to the motion to dismiss, Plaintiffs' counsel emailed defense counsel for "Defendants' position on" a motion for a preliminary injunction. Ex. 4. Plaintiffs clarified during the meet and confer that the basis for their motion for a preliminary injunction was the construction of the Uzbek aywans. Plaintiffs identified no other construction activity during that meet and confer and have identified no other construction activity in their motion for a preliminary injunction. Defense counsel again explained that the two Uzbek aywans are a temporary exhibit that have nothing to do with the National Garden of American Heroes. Nevertheless, Plaintiffs filed their combination motion for a preliminary injunction and opposition to the motion to dismiss. *See* Dkt. Nos. 15, 15-1.

In their motion for a preliminary injunction, Plaintiffs only seek relief on Count I and Count II of their Complaint. *See* Dkt. No. at 15-1 at 32 n.9. Both Count I and Count II assert claims that the "West Potomac Plan" is contrary to law in violation of the APA. Compl. ¶¶ 131-152.

## ARGUMENT

### I. The Court Should Deny Plaintiffs' Motion for a Preliminary Injunction or a 5 U.S.C. § 705 Stay

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, the moving party must make a "clear showing": (1) that it is "likely to succeed on the merits" of its claims; (2) that it is likely to suffer an irreparable injury in the absence of injunctive relief; (3) "that the balance of equities tips in [its'] favor"; and (4) that the proposed "injunction is in the public interest." *Id.* at 20-22. "The last two factors merge when the government is a party." *Harris*

*Cnty. v. Kennedy*, 786 F. Supp. 3d 194, 203 (D.D.C. 2025) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Under *Winter*, movants must establish each preliminary injunction factor independently to obtain a preliminary injunction. *See Winter*, 555 U.S. at 20-24.[1] "Requests for relief under 5 U.S.C. § 705 are evaluated under the same standards as requests for preliminary injunctions." *Coal. for Indep. Tech. Rsch. v. Rubio*, 836 F. Supp. 3d 215, 232 (D.D.C. 2026) (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)), *appeal docketed*, No. 26-5324 (D.C. Cir. Sept. 16, 2026).

Plaintiffs have failed to satisfy any of these standards. Defendants are not currently building and will not imminently build the National Garden of American Heroes, so Plaintiffs will not be irreparably harmed absent preliminary relief. The two Uzbek aywans are unrelated to Plaintiffs' claims: The Uzbek aywans are a temporary exhibit that is intended to educate visitors regarding the relationship between the United States and Uzbekistan and to provide them with the opportunity to appreciate the artistic beauty of the aywans. Plaintiffs cannot show a likelihood of success on the merits because they lack standing, their claims are not ripe, and the APA does not allow them to challenge preliminary concepts, which are not final agency actions. Granting a preliminary injunction would also be contrary to the public interest and the equities because the Court lacks subject matter jurisdiction, the requested relief would chill routine maintenance in West Potomac Park or result in unnecessary proceedings before this Court, and the requested relief would interfere with the United Sates foreign relations by halting the temporary exhibition of the Uzbek aywans. The Court should deny Plaintiffs' motion for a preliminary injunction.

---

[1] The D.C. Circuit has strongly suggested that *Winter* should "be read to require movants to establish *each* preliminary injunction factor independently," but the D.C. Circuit has not decided the question. *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1235-36 (D.C. Cir. 2025).

### A. Plaintiffs Fail to Show They Will be Irreparably Harmed Absent a Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish . . . that he is likely to suffer irreparable harm in the absence of preliminary relief[.]" *Winter*, 555 U.S. at 20. To obtain a preliminary injunction, a plaintiff "must demonstrate injury that is sufficiently certain, persuasively demonstrated, and so clearly irremediable that it warrants a court reaching out to alter the status quo before the merits are resolved." *Hanson v. District of Columbia*, 120 F.4th 223, 244 (D.C. Cir. 2024). "The purpose of a preliminary injunction is not to prevent all harm but 'merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *Id.* (citation omitted). "[A] movant's failure to show" he will suffer "irreparable harm" in the absence of preliminary relief "is grounds for refusing to issue a preliminary injunction, even if the other three factors merit such relief." *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1236 (D.C. Cir. 2025) (citation modified).

All Plaintiffs' claimed irreparable harms are based on the faulty assumption that Defendants are currently building the National Garden of American Heroes. Dkt. No. 15-1 at 33-35. Longenecker claims building the National Garden of American Heroes will "deprive [him] of the longstanding location for [his] weekly ultimate frisbee game." Longenecker Decl. ¶ 13, Dkt. No. 15-3. Stierli claims building the National Garden of American Heroes "would make it far more difficult, if not impossible, for [him] and [his] family to enjoy the park's open spaces." Stierli Decl. ¶ 40, Dkt. No. 15-4. Crutchfield and Edmondson claim the National Garden of American Heroes would be so popular that it would draw "crowds" and that sharing a public park with other people would make biking there less enjoyable. Crutchfield Decl. ¶ 10, Dkt. No. 15-5; Edmondson Decl. ¶ 11, Dkt. No. 15-6. And the organizational Plaintiffs claim they have been irreparably

harmed by Defendants not following certain compliance processes before starting construction of the National Garden of American Heroes. Dkt. No. 15-1 at 35.

But Defendants are not currently building the National Garden of American Heroes, so Plaintiffs will not "be *irreparably* harmed if [they are] required to wait until the court hears [their] case" in the ordinary course. *Hanson*, 120 F.4th at 244. The National Park Service has not made "a final decision … to site the National Garden [of American Heroes] in West Potomac Park." Griess Decl. ¶ 51. The National Park Service has "not received any direction to include the National Garden in West Potomac Park." *Id.* ¶ 52. the National Park Service "has not yet initiated a planning process that includes such a project" and "has not begun the compliance processes that would be required to implement" the National Garden of American Heroes. *Id.* ¶¶ 52-53. The National Park Service "has not begun the compliance processes that would be required to implement" the National Garden of American Heroes. *Id.* There is no "awarded . . . construction contract related to a project titled 'the National Garden of American Heroes[]'" and "no current or imminent construction activity for the National Garden of American Heroes in West Potomac Park." *Id.* ¶ 53.

Contrary to Plaintiffs' assertions, "[t]he Temporary Exhibition [of the Uzbek aywans] is separate from and unrelated to any future proposals to site the National Garden [of American Heroes] in or around West Potomac Park and is not intended to be included in the National Garden, should it be sited in West Potomac Park." *Id.* ¶ 56. Because the Uzbek aywans have nothing to do with the National Garden of American Heroes, their installation does not demonstrate that the National Garden of American Heroes is being constructed, that the National Garden of

American Heroes will imminently be constructed, or that construction of the National Garden of American Heroes will irreparably harm Plaintiffs unless such construction is enjoined.[2]

Moreover, the temporary display of two Uzbek aywans that are approximately 31 feet in diameter do not cause any of Plaintiffs' complained-of harms. There are still acres of open fields that Longenecker can use to play ultimate frisbee with his friends and that Stierli can enjoy with his family. Griess Decl. ¶¶ 15-18, 28, 38. Nor do the two Uzbek aywans block any bike lanes such that Crutchfield and Edmondson are deprived of the opportunity to bike through West Potomac Park. *See id.* In fact, the Uzbek aywans are being assembled and will be located in an area of West Potomac Park that has been unavailable to the public since late 2023, so the Uzbek aywans do not impair Plaintiffs interests. *Id.* Plaintiffs acknowledge that this "corner of West Potomac Park . . . had previously been fenced off" and that the "construction work was ongoing within the fenced area." Dkt. No. 15-1 at 11 (citing Dkt. No. 15-4 ¶¶ 43, 45). Insofar as Plaintiffs (at 15-16, 20) gesture at the Uzbek aywans somehow diminishing their enjoyment of the MLK and FDR memorials, the Uzbek aywans are a half a mile away from the MLK memorial and a third of a mile away from the FDR memorial and there is a grove of trees between the Uzbek aywans and those memorials. Ex. 5 (FDR Memorial Map); Ex. 6 (MLK Memorial Map). The DC State

[2] Plaintiffs (at 11, 21) rely on a hearsay tweet from the Ambassador from Uzebkistan stating he was "[p]roud to see Uzbek art become part of the Garden of American Heroes." Furqat Sidiqov (@FurqatSidiq), X (Aug. 22, 2026, at 4:56 PM), https://perma.cc/Q2S4-EB2J. "While technically a court may consider hearsay evidence while ruling on a motion for a preliminary injunction," the Court should afford the tweet "little weight" because it is directly contradicted by a sworn declaration. *Musk v. OpenAI, Inc.*, 769 F. Supp. 3d 1017, 1026 (N.D. Cal. 2025). *See also United States v. Quadro Corp.*, 916 F. Supp. 613, 617 (E.D. Tex. 1996) ("While [a party] may use hearsay to support its application for preliminary injunction, hearsay should be given less credence than direct allegations."); *Tex. Health & Hum. Servs. Comm'n v. United States*, 166 F. Supp. 3d 706, 711 n.5 (N.D. Tex. 2016) (similar); *Biomin Am., Inc. v. Lesaffre Yeast Corp.*, No. 20-cv-02109, 2020 WL 1503475, at *7 (D. Kan. Mar. 30, 2020) (similar). Plaintiffs have not provided "a single declaration" corroborating their theory that the Uzbek aywans are part of the Garden of American Heroes. *Musk*, 769 F. Supp. 3d at 1026.

Historic Preservation Office also determined the Uzbek aywans will have no adverse effect on historic properties if they are installed as proposed. Griess Decl. Ex. B. (DC SHPO Section 106 Review Form). In addition, to qualify as an "irreparable" harm, "the injury must be beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Here, the two Uzbek aywans will be in West Potomac Park for less than six months, at which point they will be removed and their former sites will be remediated. Greiss Decl. ¶¶ 22, 27. Finally, Plaintiffs point to no procedural injuries related to the temporary exhibition of the Uzbek aywans. The Uzbek aywans have nothing to do with Plaintiffs' claims for relief, do not cause any of the harms of which Plaintiffs complain, and do not support granting Plaintiffs a preliminary injunction.

Plaintiffs' lack of "urgency in obtaining relief" further "undercuts" their "claims of irreparable harm." *Hanson*, 120 F.4th at 245-46. Plaintiffs (at 11) cite a news report and a social media post about the Uzbek aywans from mid-August as support for the false notion that the Uzbek aywans presage the construction of the National Garden of American Heroes. Following those reports, representatives from multiple Plaintiffs took the time to sit for an interview with a reporter from the New York Times to discuss the National Garden of American Heroes and Plaintiffs' lawsuit. *See* Emily Badger, *Trump's D.C. Makeover Projects Are 'Only an Idea,' Until They're Much More*, N.Y. Times (Sep. 3, 2026), https://perma.cc/JFL3-LGSB. Plaintiffs waited until after that article was published to contact Defendants about the Uzbek aywans and potential emergency relief. Ex. 2. Plaintiffs decided not to move for emergency relief after the first meet and confer in which defense counsel explained the Uzbek aywans have nothing to do with the National Garden of American Heroes and therefore nothing to do with this lawsuit. Ex. 3. But Plaintiffs then made an unexplained about-face on emergency relief ten days later, at the deadline for their opposition

to the motion to dismiss. *See* Dkt. Nos. 14, 15. The timing of Plaintiffs' preliminary injunction motion shows there is no emergency warranting relief. Whether the Court views that lack of an emergency as undercutting Plaintiffs' claim for irreparable harm in the absence of preliminary relief, *see Hanson*, 120 F.4th at 245-46, or as favoring Defendants' position in "the balance of equities," *Benisek v. Lamone*, 585 U.S. 155, 160 (2018), the lack of emergency is the death knell for Plaintiffs' motion for a preliminary injunction.

Plaintiffs (at 34) claim "[r]ecent developments have magnified [their] injuries[,]" but all those developments relate to the temporary exhibition of the Uzbek aywans. The Uzbek aywans have nothing to do with the National Garden of American Heroes, Plaintiffs' claims for relief, or any of the harms of which Plaintiffs complain. Griess Decl. ¶ 56. The Uzbek aywans also have not displaced recreational use because, as Plaintiffs acknowledge, that area of West Potomac Park has long been closed to the public. Dkt. No. 15-1 at 11 (citing Dkt. No. 15-4 ¶ 43).

Plaintiffs (at 34) assert that "more extensive work appears to be just around the corner, as Defendants have awarded a contract concerning the western portion of the Tidal Basin area" but omit that the documents they cite say nothing about a statue garden. *See C--NAMA 245076 - Tidal Basin Redevelopment Plan*, SAM.gov, https://perma.cc/P67C-RL5K (last visited Oct. 6, 2026); Dkt. No. 15-14 (Scope of Work for Architect/Engineering & Environmental Planning Services). The Request for Qualifications seeks "Architectural & Engineering Services", i.e., preliminary design services. Dkt. No. 15-13. And the scope of work makes clear that the contract awarded also includes assistance with related environmental compliance activities and deliverables throughout the planning process. *See* Dkt. No. 15-14. The scope of work does not include construction work, and, as Griess explains, no construction contract has been awarded. Griess Decl. ¶¶ 50, 53. Regardless, Plaintiffs' "theoretical" claims cannot establish irreparable harm.

*Chaplaincy*, 454 F.3d at 297 (citation omitted), *abrogated on other grounds, Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

Finally, Plaintiffs (at 35) claim they have been "irreparably harmed by Defendants' failure to comply with legally required processes before adopting and implementing the West Potomac Plan." These claimed injuries are based on the false premise that the government has skipped applicable legal compliance and begun construction of the National Garden of American Heroes. There is no West Potomac Plan, the National Park Service has not authorized construction of the National Garden in West Potomac Park, there is no "award[] [of] a construction contract related to a project titled 'the National Garden of American Heroes[]'", and "there is no current or imminent construction activity for the National Garden of American Heroes in West Potomac Park." Griess Decl. ¶¶ 51-57. The National Park Service has not reached a point in the decision-making process where the laws Plaintiffs claim Defendants sidestepped would be applicable. And the National Park Service "would comply with all applicable laws and regulations prior to" building the National Garden of American Heroes.

* * *

Plaintiffs have failed to show they will "suffer irreparable harm in the absence of preliminary relief[.]" *Winter*, 555 U.S. at 20. That failure alone "is grounds for refusing to issue a preliminary injunction" and a § 705 stay. *Clevinger*, 134 F.4th at 1236 (citation modified).

### B. Plaintiffs Fail to Show a Likelihood of Success on the Merits of Their Claims

#### 1. *Plaintiffs Lack Standing to Challenge the Preliminary Concept for the Garden of American Heroes*

To demonstrate standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed

by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs have the burden of establishing all three elements for every claim. *Id.* Standing must exist "when the suit was filed," *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008), and must "persist throughout all stages of litigation," *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013). To have standing for "forward-looking relief" such as a preliminary injunction, Plaintiffs must make a "clear showing" of an "imminent future injury." *Murthy v. Missouri*, 603 U.S. 43, 58-59 (2024). The injury must be "*certainly* impending," and "[a]llegations of *possible* future injury" fail to establish standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted).

Plaintiffs affirmatively waive any argument that they have been injured by Secretary Burgum's social media post and remarks to the press. Dkt. 15-1 at 19 n.3. All Plaintiffs' claimed injuries "stem" from the alleged "West Potomac Plan." *Id.* Because that plan does not exist, Griess Decl. ¶ 57, Plaintiffs have not been harmed by the plan and Plaintiffs lack standing.

*First*, the alleged West Potomac Plan does not itself harm Plaintiffs because it does not exist. Plaintiffs define "West Potomac Plan" as "Defendants' plan to transform West Potomac Park into the National Garden of American Heroes or any similar garden complex." Dkt. 15-15. As Griess explains, the National Park Service does not have any project labeled the "West Potomac Plan" and does not have any current project matching Plaintiffs' description. Griess Decl.¶ 57. At most, the President and Secretary Burgum shared a preliminary concept for the National Garden of American Heroes that does not harm Plaintiffs because it "imposes no obligations on" Plaintiffs. *Trump v. California*, No. 26A124, 2026 WL 2473573, at *2 (U.S. Aug. 24, 2026). That preliminary concept does not affect any of Plaintiffs' legal rights, and the concept does not itself change the landscape of West Potomac Park or affect Plaintiffs' aesthetic or recreational interests.

*Second*, Defendants have not harmed Plaintiffs by "adopting" the preliminary concept for the National Garden of American Heroes. Plaintiffs argue they have suffered procedural injuries because Defendants "adopted" the West Potomac Plan without following the CWA procedures. Dkt. 15-1 at 22-24. But the Park Service does not have a project matching Plaintiffs' "West Potomac Plan." Griess Decl. ¶ 57. And sharing the preliminary concept for the National Garden of American Heroes does not require the statutory approvals Plaintiffs cite. The CWA requires the Secretary of the Interior to determine that "the National Capital Planning Commission and the Commission of Fine Arts" have approved the site and design "[b]efore issuing a permit for the construction of a commemorative work in the District of Columbia." 40 U.S.C. § 8906(a). But Plaintiffs neither identify nor challenge any permitting decision, and Defendants have not issued a permit for the construction of the National Garden of American Heroes. Griess Decl. ¶ 53. Even if Plaintiffs were correct that the National Garden of American Heroes would be a commemorative work subject to the CWA, Defendants have not violated the § 8906(a).

Plaintiffs (at 30-32) cite various other provisions they argue prohibit "locating," "construct[ing]," "author[izing]," and "erect[ing]" the National Garden of American Heroes in West Potomac Park without sufficient approvals. But Defendants have not authorized construction of the National Garden of American Heroes, are not currently constructing the National Garden of American Heroes and will comply with all applicable law prior to constructing the National Garden of American Heroes. Griess Decl. ¶¶ 51-57. Even assuming *arguendo* Plaintiffs' interpretations of these statutes are correct and that these statutes would apply to the National Garden of American Heroes, Defendants have not violated these other provisions and Plaintiffs do not have any procedural injuries.

Plaintiffs also gesture at alleged procedural harms due to Defendants' failure to follow the procedures in NEPA and Section 106 of the NHPA. Dkt. 15-1 at 23. "Because standing is not dispensed in gross," plaintiffs must prove facts supporting each element of standing "for each claim that they press against each defendant and for each form of relief that they seek." *Murthy*, 603 U.S. at 44 (citation modified). Plaintiffs do not assert their NEPA and NHPA claims in their motion for a preliminary injunction, so those alleged harms cannot support standing for the relief claimed here. Regardless, as explained in Defendants Motion to Dismiss, Plaintiffs have not suffered any procedural injuries from Defendants' failure to follow NEPA or Section 106 of the NHPA because Defendants have not taken any action that would trigger those procedural requirements. Dkt. 13-1 at 15. Agencies must comply with NEPA "when they approve a major federal action." *Sierra Club v. Fed. Energy Regul. Comm'n*, 153 F.4th 1295, 1303 (2025) (citation omitted). Section 106 of the NHPA requires federal agencies to "take into account the effect of the undertaking on any historic property" "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license. 54 U.S.C. § 306108. Plaintiffs provide zero evidence any of these triggering events have occurred. And, as Griess explains, the National Park Service "has not begun the compliance processes that would be required to implement this potential project" because the National Park Service "not received direction to include the National Garden in West Potomac Park." Griess Decl. ¶ 52. Because the procedural requirements of Section 106 of the NHPA and NEPA have not attached, Plaintiffs have no procedural injuries.[3]

[3] To the extent that Plaintiffs contend that the Tidal Basin Plan is an implementation of the "West Potomac Plan," revisions to that plan are in the preliminary stages and the documents attached to Plaintiffs' motion demonstrate that

Plaintiffs' position (at 24) that Defendants needed to comply with the CWA, NEPA, and Section 106 of the NHPA before "*deciding*" to pursue the National Garden of American Heroes has no basis in those statutes or case law. The requirements of those statutes are not triggered by Secretary Burgum's thoughts about a potential future project. Nor can Secretary Burgum's thoughts on the National Garden of American Heroes be reviewed for compliance with NEPA, the CWA, and Section 106 of the NHPA. Instead, those preliminary concepts must be developed into concrete proposals that define the project's scope before they can be reviewed for legal compliance. Greiss Decl. ¶ 44.. That has not happened yet. *Id.* ¶ 52.

*Third*, Defendants have not implemented the alleged West Potomac Plan and there is no imminent construction activity. Plaintiffs (at 14-22) contend that building the National Garden of American Heroes will harm their recreational and aesthetic interests. Longenecker claims that construction of the National Garden of American Heroes will prevent him from playing ultimate frisbee in West Potomac Park. Dkt. 15-1 at 15 (citing Dkt. 15-3). Stierli, a member of NPCA, claims construction of the National Garden of American Heroes will eliminate "open spaces" in West Potomac Park he enjoys with his family. *Id.* (citing Dkt. 15-4). Edmondson and Crutchfeld claim they bike around West Potomac Park, that the National Garden of American Heroes will draw "crowds," and that sharing a public park with other people will reduce their enjoyment of the park. *Id.* (citing Dkt. 15-5, 15-6).[4] But because Defendants are not currently building the

---

National Park Service intends to comply with NEPA and Section 106 of the NHPA, and the National Park Service intends to seek relevant approvals from NCPC and CFA. Dkt. 15-13; Dkt. 15-14; Griess Decl. ¶¶ 39-50.

[4] Because West Potomac Park is "a public park" intended to be "used as a park for the recreation and pleasure of the people," Edmondson and Crutchfeld do not have a legally protected interest in biking through the park without encountering other visitors or only encountering the number of other visitors they would prefer. DC Code § 10–147 (codifying 29 Stat. 624, cg, 375 (1897)). Plaintiffs cite nothing for the proposition that Edmondson and Crutchfeld are harmed by sharing a public park they do not own with other members of the public. Edmondson's and Crutchfeld's

National Garden of American Heroes and will not imminently begin construction, Griess Decl.¶ 53, none of these "[a]llegations of *possible* future injury" establish standing. *Clapper*, 568 U.S. at 409 (citation omitted).

Plaintiffs' possible future injuries are also based on improper speculation about "how the Executive Branch might eventually implement" a Presidential desire. *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam). The D.C. Circuit has "been reluctant to find standing based on predictions of how agencies will exercise discretion in future proceedings." *Union of Concerned Scientists v. U.S. Dep't of Energy*, 998 F.3d 926, 930 (D.C. Cir. 2021). That is because "judicial experience and common sense teach that the outcome of a complex bureaucratic process"—even when the President has given specific directions to an agency—"is difficult to predict" because "expectations may be wrong, and intentions may change." *Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*, 656 F. Supp. 3d 137, 152 (D.D.C. 2023) (citation modified). At this stage, the National Garden of American Heroes is just a preliminary concept: The National Park Service has not even made a final decision "to site the National Garden in West Potomac Park," much less developed a plan for the National Garden of American Heroes that is ready for implementation. Griess Decl. ¶ 51. Today, it is unclear whether the National Garden of American Heroes will be in West Potomac Park, where in the 409 acres of West Potomac Park the National Garden of American Heroes would be built, what the size and scope of the National Garden of American Heroes would be, how the National Garden of American Heroes would affect open spaces, or how crowded the area around the National Garden of American Heroes would be

---

claims of injuries based on crowding also cannot support standing because "plaintiffs attempting to show causation generally cannot rely on speculation about the unfettered choices made by independent actors not before the courts." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (citation modified).

during the times Plaintiffs might visit the park in the future. Plaintiffs' speculation about how the National Garden of American Heroes might affect their interests at some unknown point in the future is insufficient for standing. *Clapper*, 568 U.S. at 409.

Plaintiffs (at 18) claim they satisfy the imminence requirement of standing because Secretary Burgum, the President, and a non-party private fundraiser have spoken about the National Garden of American Heroes. But as Griess explains, construction has not begun and will not imminently begin. Griess Decl. ¶ 53.

Although Plaintiffs (at 19) are correct they "need not wait for Defendants to break ground to establish standing," they must still show an imminent injury. The cases on which Plaintiffs rely show how far Plaintiffs are from establishing that their potential injury is "certainly impending." *Clapper*, 568 U.S. at 414. Unlike the petition in *In re Idaho Conservation League*, Defendants do not have "concrete plans to proceed" with the National Garden of American Heroes, which is merely a preliminary concept. 811 F.3d 502, 509 (D.C. Cir. 2016). While the Plaintiffs in *Sierra Club v. Jewell* could establish a "substantial probability" that mining would occur because the mining company had "two active permits that encompass[ed]" the relevant area, here there is no active permit for construction of the National Garden of American Heroes. 764 F.3d 1, 7 (D.C. Cir. 2014). And unlike the plaintiffs in *Jibril v. Mayorkas*, who were on a "terrorist watchlist" and who would be subject to government action if they traveled, Plaintiffs here are not subject to the preliminary concepts for the National Garden of American Heroes. 20 F.4th 804, 812 (D.C. Cir. 2021).

Plaintiffs (at 20) are wrong that there is "no uncertainty as to whether the garden complex will interfere with Plaintiffs' use of West Potomac Park." The National Park Service has not even made a final decision to place the National Garden of American Heroes in West Potomac Park.

Griess Decl. ¶ 51. Although Plaintiffs quote the President's tweet as saying that West Potomac Park will be "transformed," that statement offers no clarity on when the National Garden of American Heroes will be built or what the ultimate product will look like. Dkt. 15-1 at 20 (quoting Donald J. Trump (@realDonaldTrump), Truth Social (May 15, 2026, at 4:52 AM), https://perma.cc/M6W9-TUF2.). And the photo shared by the President and Secretary Burgum is not a design that can be implemented, or the final product of a deliberative process that is "just starting." *President Trump Announces* at 22:00-24:10 (cited at Compl. ¶¶ 106-09).

Plaintiffs (at 20) construct a strawman out of the argument that they lack an imminent injury. If the right conditions were met, Plaintiffs could have standing before "construction of the garden complex is substantially or entirely complete." But as currently presented to the Court, Plaintiffs' alleged harms from the potential construction of the Garden rest on a "speculative chain of possibilities" that does not establish that their potential injury is "certainly impending." *Clapper*, 568 U.S. at 414. Defendants *might* develop a design for the Garden; Defendants *might* issue an agency decision document approving a design for the Garden; Defendants *might* issue an agency decision document authorizing construction of the Garden; Defendants *might* construct the Garden; and construction of the Garden *might* detract from activities such as bicycling and ultimate frisbee in the park. "If such speculative future government action could support an injury in fact, it is hard to imagine what would *not* satisfy that requirement." *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 223 (D.D.C. 2020). Plaintiffs have not met their burden to show that injurious construction is, not probably, but "*certainly* impending." *Clapper*, 568 U.S. at 409 (citation omitted).

Plaintiffs (at 21) claim that construction of the Uzbek aywans proves they have imminent harms from the construction of the National Garden of American Heroes. Plaintiffs are wrong:

The Uzbek aywans are "separate from and unrelated to any future proposals to site the National Garden in or around West Potomac Park and [are] not intended to be included in the National Garden, should it be sited in West Potomac Park." Griess Decl. ¶ 56. And the approximately 31-foot in diameter Uzebk aywans, which are being assembled in an area of the park that was previously unavailable to the public, do not impinge on Plaintiffs aesthetic or recreational interests in West Potomac Park. The temporary exhibition of the Uzbek aywans do not support Plaintiffs' claims for an imminent injury.

2. *Plaintiffs' Challenge to the Preliminary Concept for the Garden of American Heroes Is Not Ripe*

"A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Doe v. Doe Agency*, 608 F. Supp. 2d 68, 72 (D.D.C. 2009) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). "Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (citation modified). Ripeness has two facets: constitutional, which asks whether a plaintiff has alleged an injury sufficient to invoke subject-matter jurisdiction, and prudential, which "concerns the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Giron v. Zeytuna, Inc.*, 597 F. Supp. 3d 29, 54 (D.D.C. 2022) (citation modified).

"Constitutional ripeness is subsumed into the Article III requirement of standing, which requires a petitioner to allege *inter alia* an injury-in-fact that is imminent or certainly impending."

*POET Biorefining, LLC v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020) (citation modified). As explained above, *supra* Argument § I, Plaintiffs' alleged injuries tied to the construction of the Garden are neither imminent nor certainly impending because "there is no current or imminent construction activity for the National Garden of American Heroes in West Potomac Park." Griess Decl. ¶ 53. Plaintiffs also cannot allege informational and procedural harms from Defendants allegedly disregarding statutes they have not yet violated and that they have committed to satisfying, if and when those statutory requirements become applicable. Griess Decl. ¶ 54; *Trump Announces Planned D.C. Site for Massive Sculpture Garden*, Wash. Post (May 15, 2026), https://perma.cc/L3MY-WN9P (cited at Compl. ¶ 104). Plaintiffs' injuries are neither imminent nor certainly impending, so this case is constitutionally unripe.

The Court should also decline to review this dispute on prudential grounds. "[T]he doctrine of prudential ripeness ensures that Article III courts make decisions only when they have to, and then, only once." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012). In evaluating ripeness, courts look to "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs v. Garner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Under the fitness prong, courts must consider "[1] whether [the claim] is purely legal, [2] whether consideration of the issue would benefit from a more concrete setting, and [3] whether the agency's action is sufficiently final." *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) (citation modified). For the hardship prong, courts must ask whether the challenged administrative action is likely to have a direct and immediate effect on the "primary conduct" of the plaintiff. *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967). Plaintiffs' claims fail under both prongs of the test.

Plaintiffs' claims are not fit for review. The claims are not purely legal as they hinge on the design of the Garden (which has not been finalized by Defendants), the construction of the Garden (which has not been authorized by Defendants), and on the unfounded assumption that construction has begun without the necessary reviews and approvals. Griess Decl. ¶¶ 51-57. Waiting for the design, planning, and compliance processes to play out would provide a more "concrete" setting for judicial review. *Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007) (quoting *Abbott Labs*, 387 U.S. at 148–49). Because Defendants have not taken any action with respect to the Garden that is sufficiently final to cause an imminent or certainly impending injury, the Court should reject their claims as unripe. *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996) ("[T]he usually unspoken element of the rationale underlying the ripeness doctrine: [i]f we do not decide it now, we may never need to.").

As to the hardship prong, Plaintiffs suffer no hardship from deferred judicial review, as they can proceed with claims challenging any final agency action with which they disagree, if and when Defendants authorize a project to proceed. "If the only hardship a plaintiff will endure as a result of delaying consideration of the disputed issue is the burden of having to engage in another suit, this will not suffice to overcome an agency's ripeness challenge." *Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*, 85 F. Supp. 3d 250, 272–73 (D.D.C. 2015) (citation modified). Moreover, "plaintiffs suffer no concrete harm from" the preliminary concept for the National Garden of American Heroes, "which does not require them to do anything or to refrain from doing anything." *New York*, 592 U.S. at 134 (citation modified).

Plaintiffs (at 28) are wrong that their claims "do not require further factual development." Plaintiffs recreational and aesthetic injuries depend on the construction of the National Garden of American Heroes in areas of West Potomac Park that Plaintiffs use. Construction has not begun,

and the National Park Service has not made a final decision to locate the National Garden of American Heroes in West Potomac Park. Griess Decl. ¶¶ 51, 53. Plaintiffs' claimed procedural injuries are not ripe because no actions have triggered those procedural requirements. And Plaintiffs claimed procedural injuries will likely never ripen, as the National Park Service would comply with "all applicable laws and regulations prior to implementing" the National Garden of American Heroes. Griess Decl. ¶ 54.

Plaintiffs (at 29) are wrong that the Court and Defendants have no "institutional interests favoring postponement of review." Because the National Park Service will comply with all applicable law if it receives direction to move forward with the National Garden and if the planning processes for the Garden results in a final agency action, Griess Decl. ¶ 54, the Court may never have to adjudicate this case and has an institutional interesting in refraining from "entangling" itself in this dispute. *Devia*, 492 F.3d at 424. *See also Nat'l Treasury Emps. Union*, 101 F.3d at 1431 ("[T]he usually unspoken element of the rationale underlying the ripeness doctrine: [i]f we do not decide it now, we may never need to."). Defendants also have an institutional interest in postponing review until Plaintiffs have a concrete injury. As evidenced by the current planning process for the Tidal Basin, there are many stages of project development and multiple opportunities for public input before a final decision is made. Griess Decl. ¶¶ 39-50. The government and the public have an interest in allowing these planning processes to play out as intended, without judicial supervision.

Plaintiffs (at 29-30) are also wrong that they will suffer hardship if the suit is dismissed on ripeness grounds. Plaintiffs' claims of hardship are all predicated on the false assumption that Defendants are currently building the National Garden of American Heroes in West Potomac Park. But Defendants are not currently building the National Garden of American Heroes in West

Potomac Park. Griess Decl. ¶ 53. Plaintiffs will suffer no hardship from a delayed resolution of this dispute, which may never ripen into an actual case or controversy.

3. *The Preliminary Concept for the National Garden of American Heroes Is not an Agency Action Subject to APA Review.*

APA review is limited to the review of "agency action." 5 U.S.C. § 702. The term "'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Because the definition of "agency action" is limited, courts do not "exercise judicial review over everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (citation modified); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990) (The APA does not authorize "general judicial review of the [agency's] day-to-day operations"). "Agencies prepare proposals, conduct studies, meet with members of Congress and interested groups, and engage in a wide variety of activities that comprise the common business of managing government programs," none of which constitutes agency action subject to APA review. *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006). Instead, "[a]n 'agency action' is an agency's determination of rights and obligations." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 804 (D.C. Cir. 2023). An agency action must be "circumscribed" and "discrete" to be the subject of judicial review under the APA. *Fund for Animals, Inc.*, 460 F.3d at 20 (quoting *Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 62 (2004)).

The only "circumscribed" and "discrete" actions Plaintiffs note in their Complaint are (i) the Secretary Burgum's social media post stating "@POTUS is continuing to honor our nation's legacy with the National Garden of American Heroes," Compl. ¶¶ 102-03, and (ii) Secretary Burgum's comments at a press conference generally describing the Garden and other projects the

administration is "just starting," *President Trump Announces*, at 22:00–26:07 (cited at Compl. ¶¶ 106-09). But Plaintiffs have affirmatively waived any argument "that Secretary Burgum's social media post and public remarks … constitute agency action." Dkt. 15-1 at 26 n.7.

Instead, Plaintiffs contend that "the relevant agency action here is the West Potomac Plan"—which is a term invented by the Plaintiffs, not an action by the government. *Id.* Plaintiffs define the "West Potomac Plan" as "Defendants' plan to transform West Potomac Park into the National Garden of American Heroes or any similar garden complex." Dkt. 15-15. No such "plan" exists. Greiss Decl. ¶ 56. Although the President and the Secretary of the Interior have identified West Potomac Park as the current preferred location for the National Garden of American Heroes, the National Park Service has not made a final decision to site the National Garden of American Heroes in West Potomac Park. *Id.* ¶ 51. At most, Secretary Burgum has informed the public of the President's "vision" for the National Garden of American Heroes. *President Trump Announces* at 24:10-26:07 (cited at Compl. ¶¶ 106-09).

Even if the "Plan" existed, an inchoate plan for potential future construction does not "impos[e] any obligation, deny[] any right, or fix[] any legal relationship." *Indep. Equip. Dealers*, 372 F.3d at 427 (citation modified). *See also Fund for Animals v. Williams*, 391 F. Supp. 2d 132, 137 (D.D.C. 2005) ("[T]he Strategic Plan does not constitute a judicially reviewable final action."). The preliminary concept for the National Garden of American Heroes does not itself change the landscape of West Potomac Park. Nor does the preliminary concept for the National Garden of American Heroes change Plaintiffs'—or anyone's—legal rights or obligations. As of now, the National Garden of American Heroes is just an idea shared by the President and Secretary Burgum with the public. That idea may well develop into a proposal. If that proposal meets all applicable legal requirements, it may then lead to agency decision documents such as permits or construction

contracts. Those agency decision documents may then lead to construction. But as of now, the preliminary concept for the National Garden of American Heroes is, at most, a tentative plan. And "[p]reparing" a plan is part of "the common business of managing government programs" that is not subject to APA review. *Fund for Animals*, 460 F.3d at 20.

Plaintiffs (at 25-26) argue the "West Potomac Plan" "constitutes a decision to transform the park into a garden complex" and that "decision" is an "agency action" under the APA. But even if this were true, not every decision an agency makes constitutes agency action, and holding otherwise would wrongly extend "judicial review" to cover "everything done by an administrative agency." *Indep. Equip. Dealers*, 372 F.3d at 427. Agencies make myriad decisions when they "engage in a wide variety of activities that comprise the common business of managing government programs." *Fund for Animals*, 460 F.3d at 20. But it is only when those decisions have an "actual legal effect," *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (2014), and determine "rights and obligations" that they constitute agency actions subject to APA review. *Am. Forest*, 77 F.4th at 804. The government has not developed anything like the "West Potomac Plan" that Plaintiffs imagine. Griess Decl. ¶ 57. What the President and Secretary Burgum have done is discuss their preliminary concepts for the National Garden of American Heroes. Those preliminary concepts have no "actual legal effect" and are not agency actions. *Nat'l Min. Ass'n* 758 F.3d at 252; *Fund for Animals*, 460 F.3d at 20

4. *The Preliminary Concept for the National Garden of American Heroes Is not a Final Agency Action Subject to APA Review.*

Judicial review under the APA is limited to challenges to "final agency action." 5 U.S.C. § 704. "[T]wo conditions must be satisfied for agency action to be final": (i) "the action must mark the consummation of the agency's decision-making process" and (ii) "the action must be one

by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations modified). "The most important factor" when determining whether something is a final agency action is "the actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Nat'l Min. Ass'n* 758 F.3d at 252.

*First*, although Plaintiffs challenge what they dub the "West Potomac Plan," no such plan exists. *Supra* § II.C. Insofar as there is a plan, it is a preliminary concept with no "actual legal effect" that is not a final agency action subject to APA review. *Nat'l Min. Ass'n* 758 F.3d at 252; *Fund for Animals*, 460 F.3d at 20. Agencies work on preliminary concepts every day as part of the common business of managing government programs. Plaintiffs' contention that the alleged West Potomac Plan constitutes a final agency action implies the availability of "judicial review over everything done by an administrative agency." *Indep. Equip. Dealers*, 372 F.3d at 427 (citation modified). Plaintiffs' all-encompassing view of APA review contravenes "common sense, basic precepts of administrative law, and the Administrative Procedure Act itself." *Id.*

*Second*, the National Garden of American Heroes is one of several "projects that [the Administration is] just starting." *President Trump Announces* at 22:00-24:10 (cited at Compl. ¶¶ 106-09). The National Park Service has not made a "final decision…to site the National Garden in West Potomac Park," has "not received any direction to include the National Garden in West Potomac Park," has not "initiated a planning process that includes such a project," "issued a permit for construction of the National Garden in West Potomac Park," "awarded a construction contract" for the National Garden of American Heroes, or started construction of the National Garden of American Heroes. Griess Decl. ¶¶ 51-53. The supposed "West Potomac Plan" does not "mark the consummation of the agency's decision-making process" because that process has just begun. *Bennett*, 520 U.S. at 178 (citation modified).

Plaintiffs (at 26) protest that Secretary Burgum's tweet about the National Garden of American Heroes was not explicitly "conditioned on any future developments." But focusing on the wording of a tweet is contrary to the "the pragmatic approach" courts "have long taken to finality." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (citation modified). As Plaintiffs acknowledge (at 27) "Defendants must take additional steps" before there are any effects on West Potomac Park. A tweet announcing an intention to build the National Garden of American Heroes is a communications strategy, not a final agency action.

Plaintiffs (at 28) misdirect the Court by referring to the actions of non-parties. The President is not a party to this lawsuit. Dkt. 1. Nor is the private donor Plaintiffs allege has solicited funds for the National Garden of American Heroes. *Id.* Their actions are irrelevant to whether Defendants have reached the "consummation" of their decision-making process regarding the National Garden of American Heroes.

Plaintiffs (at 29) claim Defendants have "concocted" an "APA workaround," but it is Plaintiffs who are trying to avoid the APA's requirement of a final agency action. The "final agency action" requirement is in the text of the APA, *see* 5 U.S.C. § 704, and longstanding Supreme Court precedent holds the APA limits review to final agency actions. *See, e.g.*, *Lujan*, 497 U.S. at 882. That requirement exists to prevent premature claims that stymie an agency's deliberative process and prevent judicial review "over everything done by an administrative agency." *Indep. Equip. Dealers*, 372 F.3d at 427 (citation omitted).

Plaintiffs (at 29) reference to the litigation over the East Wing of the White House does not help them because the district court in that case rejected the Plaintiffs' APA claims. *See Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.*, 821 F. Supp. 3d 62, 71-73 (D.D.C. 2026). In all events, Defendants are not currently building the National Garden of American

Heroes and do not have a contract for construction services to build the National Garden of American Heroes. Griess Decl. ¶ 58. Defendants are committed to following all applicable legal requirements before building the National Garden of American Heroes. *Id.* ¶ 54.

### C. The Public Interest and the Equities Favor Denying Injunctive Relief

Even if Plaintiffs could show irreparable harm and likelihood of success on the merits, "proper consideration" of the public interest and the balance of the equities would "require[] denial of the requested injunctive relief." *Winter*, 555 U.S. at 23. Where a "movant seeks to enjoin the government, the final two factors merge 'because the government's interest *is* the public interest.'" *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 314 (D.D.C. 2025) (quoting *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)). As explained above, Plaintiffs will not suffer any harm absent a preliminary injunction. *Supra* Section I. An injunction, however, would irreparably harm the government.

The government would "suffer irreparable harm from" an injunction that "exceed[s] the authority conferred" on federal courts. *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025). As explained above, Plaintiffs lack standing to challenge the preliminary concept for the National Garden of American Heroes and the Court lacks subject matter jurisdiction over this case. *Supra* Section II. A-B. Because the Court lacks standing, any injunction here would "improperly intrude" on the Executive Branch causing it irreparable harm. *Trump*, 2026 WL 2473573, at *4 (citation modified).

The breadth and ambiguity of Plaintiffs' requested relief exacerbates the intrusion into the Executive Branch. Plaintiffs ask the Court to enjoin the government from "implementing or giving effect to" what Plaintiffs have dubbed "the West Potomac Plan." Dkt. 15-15. Because there is no West Potomac Plan, Gries Decl. ¶ 56, it is unclear whether that injunction would prohibit, for

example, the government from further developing the preliminary concept for the National Garden of American Heroes into an actual proposal that could be submitted for review under appropriate processes. Plaintiffs further ask this Court to enjoin "any demolition or construction activity in West Potomac Park pertaining to the National Garden of American Heroes ***or any similar garden complex***." Dkt. 15-15. (emphasis added). West Potomac Park is a 409-acre park filled with gardens, memorials, commemorative landscapes, fields, and more. It is unclear what constitutes a "similar garden complex" in that multivariegated park. And as shown by Plaintiffs' decision to file a preliminary injunction based on the temporary exhibition of the Uzbek aywans, Plaintiffs are likely to misconstrue any construction or maintenance activity in West Potomac Park as being related to their suit. The result of granting Plaintiffs an injunction would either be chilling construction and maintenance activity in West Potomac Park or unnecessary proceedings before this Court. Neither result is in the public interest.

Worse yet, the temporary exhibition of the Uzbek aywans is an "Executive Branch policy with foreign affairs implications," and enjoining that activity would cause the government to "suffer a form of irreparable injury." *Trump v. Orr*, 146 S. Ct. 44, 46 (2025) (per curiam) (citation modified). The aywans were a gift from Uzbekistan to the President of the United States as a sign of friendship between the two countries. Griess Decl. ¶ 20. Fourteen master craftsmen from Uzbekistan have come to Washington, D.C. and volunteered their time to assemble the Uzbek aywans in West Potomac Park. *Id.* ¶ 29. An injunction preventing those craftsmen from completing their task or an injunction requiring the disassembly of the aywans would interfere with the United States' foreign policy and would deprive the public of the opportunity to experience the artistic beauty of the aywans.

Plaintiffs (at 35-36) assert that their merits arguments show that an injunction would be in the public interest. But Plaintiffs' merits arguments fail: Plaintiffs lack standing, this case is not ripe, and Plaintiffs have failed to state a claim under the APA. *See supra* Section I.B. Plaintiffs also overstate the holding of *League of Women Voters of United States v. Newby*, which held that an injunction was in the public interest because "[t]he public has a strong interest in exercising the fundamental political right to vote." 838 F.3d 1, 12 (D.C. Cir. 2016) (citation modified). The Court's merits analysis was only one of several factors favoring an injunction. *See id.* Here, even if Plaintiffs case had any merit, "proper consideration" of the public interest and the balance of the equities would "require[] denial of the requested injunctive relief." *Winter*, 555 U.S. at 23.

Plaintiffs (at 36) assert "there is an enormous public interest in the preservation of West Potomac Park" but fail to show West Potomac Park is in any peril. The National Garden of American Heroes is still a preliminary concept. Griess Decl. ¶¶ 51-57. If the National Park Service "were to initiate a project to include the National Garden in West Potomac Park…the [National Park Service] would comply with all applicable laws and regulations prior to implementing such project." *Id.* ¶ 54. Those laws and regulations would adequately protect the public interest. And because the National Garden of American Heroes is not currently being built and construction is not imminent, it has zero present effect on West Potomac Park.

Plaintiffs (at 36) claim "preliminary relief" is necessary "to maintain the status quo" because "[o]ngoing construction work has already displaced recreational use of West Potomac Park." Plaintiffs are wrong twice over. *First*, there is no current construction work on the National Garden of American Heroes, which is still a preliminary concept. Griess Decl. ¶¶ 51-57. *Second*, the construction work on the Uzbek aywans (which has nothing to do with the National Garden of American Heroes) has not displaced recreational use of West Potomac Park. As Plaintiffs

acknowledge "[t]he same area" being used for the temporary exhibition of the Uzbek aywans "was previously fenced off as part of ongoing construction related to a seawall restoration project." Dkt. 15-1 at 12 n.1 (citing 15-4 ¶ 43). In fact, the area where the Uzbek aywans are being assembled has been closed to the public for years. Griess Decl. ¶ 22. Plaintiffs—who claim they visit this corner of West Potomac Park "regularly"—merely state they "would have expected the Park Service to remove the fence" earlier this year. Dkt. 15-4 ¶¶ 34, 43. Plaintiffs do not say that they had access to this area of West Potomac Park before the temporary exhibition of the Uzbek aywans. And as Griess explain, work to rehabilitate the area still remains to be completed. Griess Decl. ¶¶ 18-19.

Finally, Plaintiffs (at 36) claim that allowing the government to "proceed with implementation of the West Potomac Plan" risks turning "construction of the garden complex into a *fait accompli*." But there is no current or imminent construction work on the National Garden of American Heroes, which is still a preliminary concept. Griess Decl. ¶¶ 51-57.

### II. The Court Should Grant Defendants' Motion to Dismiss

The Court should dismiss Plaintiffs' suit for lack of subject matter jurisdiction. *See* Dkt. 13-1 at 13-21. As explained above, Plaintiffs lack standing and their suit is not ripe. *Supra* §§ I.B. 1-2. To oppose Defendants' motion to dismiss, Plaintiffs rely on the declarations they provided with their preliminary injunction motion. *See* Dkt. 15-1 at 37 n.10 (citing *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 585 F. Supp. 3d 63, 70 (D.D.C. 2022). The Court should also consider the Griess declaration, which states definitively that there is no current or imminent construction work on the National Garden of American Heroes, which is still a preliminary concept. Griess Decl. ¶¶ 51-57. All Plaintiffs' alleged injuries are based on the false premise that Defendants are currently building the National Garden of American Heroes. Dkt. 15-1 at 37.

Because Defendants are not currently building the National Garden of American Heroes and will not imminently begin construction of the National Garden of American Heroes, Griess Decl.¶ 53., Plaintiffs lack an injury in fact, Plaintiffs lack standing, and Plaintiffs' case is not ripe.[5]

The Court should dismiss Plaintiffs' APA claims (Counts I-VI) for failure to state a claim. Dkt. 13-1 at 21-24. As explained above, the preliminary concept for the National Garden of American Heroes is not an "agency action" under the APA because the preliminary concept does not determine anyone's rights or obligations. *Supra* § I.B.3. The preliminary concept for the National Garden of American Heroes is also not a "final agency action" under the APA because Defendants have not consummated the decision-making process and, again, the preliminary concept does not determine anyone's rights or obligations. *Supra* § I.B.3. Accordingly, the Court should dismiss Plaintiffs' APA claims for failure to state a claim. Dkt. 13-1 at 13-24.

Finally, the Court should dismiss Plaintiffs' *ultra vires* claim (Count VII) for failure to state a claim. Dkt. 13-1 at 24-25. *Ultra vires* review is "unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review." *Nuclear Regul. Comm'n v. Texas ("NRC")*, 605 U.S. 665, 681 (2025) (citation modified). Defendants Department of the Interior and the National Park Service are agencies whose final actions are reviewable under the APA. If and when Defendants take a final agency action authorizing the construction of the Garden, their decision would be subject to judicial review under the APA, which would provide "a meaningful and adequate opportunity for

---

[5] If the Court declines to consider the Griess declaration when deciding Defendants' Federal Rule of Civil Procedure 12(b)(1) motion, the Court should still consider the Griess declaration and dismiss Plaintiffs' suit under Federal Rule of Civil Procedure 12(h)(3), which requires the Court to "dismiss the action" "any time" the Court determines "that it lacks subject-matter jurisdiction."

judicial review." *Id.* (citation omitted). Plaintiffs cannot seek judicial review before Defendants have taken final action without circumventing the APA's statutory limits. *See Glob. Health Council v. Trump*, 153 F.4th 1, 17 n.14 (D.C. Cir. 2025), *reh'g en banc denied*, No. 25-5097, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025).

Plaintiffs (at 38) do not contest that the APA provides them with a meaningful and adequate opportunity for judicial review. While Plaintiffs are wrong that the preliminary concept for the National Garden of American Heroes is a "final agency action," if and when Defendants do take a final agency action, that action will be reviewable under the APA and that future opportunity for review forecloses Plaintiffs' *ultra vires* claim. *See NRC*, 605 U.S. at 681-82; *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).[6]

Plaintiffs' *ultra vires* claim also fails to allege an "extreme" error that merits *ultra vires* review. *Nyunt*, 589 F.3d at 449 (citation omitted). *Ultra vires* review "does not apply simply because an agency has arguably reached a conclusion which does not comport with the law," so merely "dress[ing] up a typical statutory-authority argument as an *ultra vires* claim" does not make it meritorious. *NRC*, 605 U.S. at 681-82 (citation modified). Rather, *ultra vires* review "applies only when an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." *Id.* at 681 (citation modified). Here, Plaintiffs' *ultra vires* claim is based on the same typical statutory-authority arguments as their contrary-to-law APA claims. *Compare* Compl. ¶¶ 131-173 *with* Compl. ¶¶ 180-84. While Plaintiffs (at 39) claim these alleged

[6] Plaintiffs (at 39) separately argue they should not be required to follow the APA's statutory review scheme because "implementation of the plan—including construction activity at the park—is ongoing." As Griess explains, Plaintiffs are wrong: there is no West Potomac Plan, Defendants are not currently building the National Garden of American Heroes in West Potomac Park, and there is no construction services contract for construction of the National Garden of American Heroes. Griess Decl.¶¶ 51-57.

statutory violations constitute "extreme error[s]," Plaintiffs fail to show how Defendants actions are "entirely in excess of [their] delegated powers" or explain how their claims differ at all from "typical statutory-authority argument[s]" *NRC*, 605 U.S. at 681-82. Plaintiffs' "statutory argument[s] fall[] well shy of a meritorious" *ultra vires* claim. *Id*. at 682.[7] *See also Nyunt*, 589 F.3d at 449. The Court should dismiss Count VII under Rule 12(b)(6).

## CONCLUSION

The Court should deny Plaintiffs' motion and dismiss this case.

Dated: October 6, 2026

Respectfully submitted,
ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

*/s/ Ian M. Swenson*
Ian M. Swenson
Senior Counsel
Energy and Natural Resources Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, District of Columbia 20530
(202) 532-5139
Ian.Swenson@usdoj.gov

[7] Plaintiffs (at 39) cite *Nattional Trust for Historic Preservation in the United States v. National Park Service* for the proposition that a violation of 40 U.S.C. § 8106 "can support *ultra vires* review" but omit that the Court in that case only allowed the plaintiffs' *ultra vires* claim because the suit was against "the President," who "is not an "agency" subject to APA review." 185 F.4th 1185, 1223-24 (D.C. Cir. 2026). Plaintiffs, here, sue the Department of the Interior and the National Park Service, which are subject to the APA and which have different delegated authorities than the President.

**CERTIFICATE OF SERVICE**

I certify that a true copy of the above document was served upon Plaintiffs' counsel by the Electronic Case Filing system on October 6, 2026.

/s/ Ian M. Swenson

Ian M. Swenson